ALYSSON LEDESMA V. TYRUS CANTY
AND TRANSAM TRUCKING, INC.
DEPOSITION OF FERNANDO TECHY, M.D.

1             **IN THE UNITED STATES DISTRICT COURT OF**

2              **THE SOUTHERN DISTRICT OF TEXAS**

3                 **HOUSTON DIVISION**

4

5     **ALYSSON LEDESMA**          )

6        **PLAINTIFF,**        )

7                       )

8     **VS.**              )   **CIVIL ACTION NO. 4:23-CV-01983**

9                       )

10    **TYRUS CANTY AND TRANSAM** )

11    **TRUCKING, INC.**      )

12       **DEFENDANTS.**      )

13    **********************************************************

14       **NON-STENOGRAPHIC VIDEOTAPED DEPOSITION**

15          **OF FERNANDO TECHY, M.D.**

16              **VOLUME 1 OF 1**

17              **JULY 30, 2024**

18    **********************************************************

19    NON-STENOGRAPHIC DEPOSITION OF FERNANDO TECHY, M.D., HAVING BEEN

20    DULY SWORN BY LEONARD M. RHEM, NOTARY PUBLIC IN AND FOR THE STATE

21    OF TEXAS. THE WITNESS APPEARED REMOTELY FROM HARRIS COUNTY,

22    TEXAS, FROM 5:03 P.M. TO 7:39 P.M. CDT, PURSUANT TO TEXAS RULES

23    OF CIVIL PROCEDURE AND ANY PROVISIONS STATED ON THE RECORD OR

24    ATTACHED HERETO, AND SKRIBE, INC.'S TERMS & CONDITIONS OF

25    SERVICE.

Created by Skribe | support@skribe.ai

**DEFS EX G**

1

ALYSSON LEDESMA V. TYRUS CANTY
AND TRANSAM TRUCKING, INC.
DEPOSITION OF FERNANDO TECHY, M.D.

|    | **APPEARANCES OF COUNSEL** |
|----|----|
| 1  |  |
| 2  |  |
| 3  | ON BEHALF OF ALYSSON LEDESMA, PLAINTIFF: |
| 4  | PHILIP J. MORGAN |
| 5  | SORRELS LAW |
| 6  | 5300 MEMORIAL DRIVE |
| 7  | SUITE 270 |
| 8  | HOUSTON, TEXAS 77007 |
| 9  | 713-496-1100 |
| 10 | PHIL@SORRELSLAW.COM |
| 11 | APPEARED VIA VIDEOCONFERENCE |
| 12 |  |
| 13 | ON BEHALF OF TYRUS CANTY AND TRANSAM TRUCKING, INC., DEFENDANTS: |
| 14 | ESSAY EDEN |
| 15 | THOMPSON, COE, COUSINS & IRONS, LLP |
| 16 | 4400 POST OAK PARKWAY |
| 17 | SUITE 1000 |
| 18 | HOUSTON, TEXAS 77027 |
| 19 | 713-403-8210 |
| 20 | EEDEN@THOMPSONCOE.COM |
| 21 | APPEARED VIA VIDEOCONFERENCE |
| 22 |  |
| 23 |  |
| 24 |  |
| 25 |  |

ALLISON LEDSIVA, ET AL., VS. JOHN DOE AND TRANSAM TRUCKING, INC.
DEPOSITION OF FERNANDO TECHY, M.D.

```
1                        INDEX TO EXAMINATION

2

3    EXAMINATION                                          PAGE

4    EXAMINATION BY MR. MORGAN                            5

5    EXAMINATION BY MR. EDEN                              47

6    EXAMINATION BY MR. MORGAN                            82

7    EXAMINATION BY MR. EDEN                              86

8

9

10

11                       INDEX TO EXHIBITS

12   NO.                      DESCRIPTION                 PAGE

13   EXHIBIT 1                ALLIED ORTHOPEDICS MEDICAL RECORDS  8

14   EXHIBIT 2                MRI OF CERVICAL SPINE        10

15   EXHIBIT 3                MRI AXIAL VIEW               15

16   EXHIBIT 4                MRI OF LUMBAR SPINE          16

17   EXHIBIT 5                ORIGIN MRI                   16

18   EXHIBIT 6                IMAGE OF ANNULAR TEAR        18

19   EXHIBIT 7                HOUSTON MRI                  18

20   EXHIBIT 8                IMAGE OF CERVICAL FACET JOINT  20

21                           INJECTION

22   EXHIBIT 9                ORIGIN SPINE MEDICAL RECORDS  22

23   EXHIBIT 10               IMAGE OF RFA                 26

24   EXHIBIT 11               ALLIED ORTHOPEDICS CLINICAL NOTES  30

25   EXHIBIT 12               SUMMARY OF CONFERENCE DOCUMENT  34
```



ALYSSON LEDESMA v. TYRUS CANTY
AND TRANSAM TRUCKING, INC.
DEPOSITION OF FERNANDO TECHY, M.D.

1        NOTARY:  The time is 5:03 p.m., Central Time.  The date is

2  July 30th, 2024.  We are on the record.  This is the oral, non-

3  stenographic deposition of Fernando Techy, M.D., taken under Alysson

4  Ledesma v. Tyrus Canty and TransAm Trucking, Inc. in Case Number 4:23-

5  CV-01983.

6        Today's deposition is being conducted remotely.  My name is

7  Leonard Rhem, Certified Notary in the state of Texas.  My license number

8  is 132988515.  I'm administering the oath from Round Rock, Texas, and

9  the witness is located in Houston, Texas.

10       By entering this Skribe event, parties present have agreed to

11  Skribe's terms of service and acknowledge this deposition is occurring

12  non-stenographically and is being recorded by the scheduling attorney

13  through Zoom.

14       At this time, would Counsel please state your appearance and

15  location for the record.

16       PHILIP MORGAN:  Phil Morgan for plaintiff, Harris County,

17  Texas.

18       ESSAY EDEN:  Essay Eden on behalf of the defendants in

19  Houston, Harris County, Texas.

20       NOTARY:  Thank you.  Mr. Techy, will you please raise your

21  right hand?

22       Do you solemnly swear the testimony you're about to give is

23  the truth, the whole truth, and nothing but the truth?

24       WITNESS:  I do.

25       NOTARY:  Thank you.  Attorneys, you may now proceed.



ALYSSON LEDESMA v. TROY GANT AND
AND TRANSAM TRUCKING, INC.
DEPOSITION OF FERNANDO TECHY, M.D.

```
 1                          EXAMINATION
 2   BY PHILIP MORGAN:
 3        Q    Doctor, can you please introduce yourself to the jury?
 4        A    Yeah, my name is Fernando Techy.  I am an orthopedic spine
 5   surgeon.
 6        Q    Doctor, do you understand that we are interested in the
 7   injuries that Alysson Ledesma suffered on April 7th, 2022?
 8        A    I am.
 9        Q    Okay.  You treated Alysson for her injuries, right?
10        A    That's correct.
11        Q    Would you list for us the principal injuries for which you
12   were treating Alysson?
13        A    Yeah.  Alysson is a young lady that came to us complaining of
14   neck and low back pain.  In -- in summary, she had herniated discs at
15   C4-5 and C5-6, as well as an L4, L5 in the lumbar spine.  So we treated
16   her for the pain that was coming from those disc herniations and -- and
17   all the -- all the consequences they caused to -- to the lumbar and
18   cervical spine.
19        Q    Based on your experience and training, within a reasonable
20   degree of medical probability, is it your opinion that the injuries
21   suffered by Alysson were caused by the crash on April 7th, 2022?
22        A    Yes.
23        Q    Can you briefly describe the treatment Alysson had as a result
24   of these injuries from the car crash on April 7th, 2022?
25        A    Oh, I believe Alysson had, like everybody, she starts with
```

ALYSSON LEDEZMA, ET AL. V. LUIS SOTO
AND TRANSAM TRUCKING, INC.
DEPOSITION OF FERNANDO TECHY, M.D.

1   physical therapy, oral medication.  And then as that -- that didn't

2   really -- she wasn't happy enough with the -- with the results of those,

3   then she starts getting -- getting injections.  Then what we did, we did

4   injections.  I believe I did one course of injections for her in the

5   cervical and in the lumbar spine.  Those are called medial branch blocks.

6   And we did -- let me see what I did here.  I believe I did only the

7   lumbar spine because it -- it was going to be done -- the neck was going

8   to be done next.

9           And yeah, so I only did the lumbar spine, and we were planning

10  on doing her cervical spine.  And -- and -- and -- and as she did somewhat

11  well with the first ones, we were going to do a second round of injections

12  that -- that are called rhizotomies.  That's almost like a mini surgery

13  that it's done percutaneously, that we burn the nerves to the spine with

14  the objective of so the patient doesn't have pain in the area anymore.

15  Yeah, so that's what we -- we -- we -- we did for her.

16      Q    Based on your experience and training, within a reasonable

17  degree of medical probability, is it your opinion that the treatment

18  Alysson received as a result of her injuries was medically necessary to

19  treat the injuries she sustained in the crash?

20      A    I believe so.

21      Q    Okay.  Doctor, today, in any question in which I ask for your

22  opinion, there's an implied part of my question, which is that the

23  opinion is within a reasonable degree of medical probability.  I want

24  you to answer my questions only if you can do so to a reasonable degree

25  of medical probability.  Do you agree that in answering my question,

ALYSSON LADYNSKA vs. TROY DAVIS
AND TRANSAM TRUCKING, INC.
DEPOSITION OF FERNANDO TECHY, M.D.

1   you'll only give an opinion that is within a reasonable degree of medical

2   probability?

3        A     I agree.

4        Q     Okay.  Doctor, are you a specialist in a certain field of

5   medicine?

6        A     I am.

7        Q     Can you tell the jury a little bit about that field?

8        A     Yeah, I'm -- I'm a specialist in spine surgery.  So I mean,

9   basically is the -- the -- we treat people with spine injuries.  Either

10  they're from trauma from accidents or they're from just wear and tear,

11  aging, as the body grows old and people develop spine problems.

12            I do -- we -- we -- I -- I see patients from the beginning to

13  the end of their treatment, from they're coming to the office simply

14  ordering some physical therapy and -- and some oral medication in the --

15  in the cases that are in the beginning.  A lot of people get better that

16  way.  That -- that doesn't work, then we move on to injections, such as

17  epidurals, medial branch blocks.  If that doesn't work, then we go on

18  to rhizotomies, which is the burning of the nerves.  And if that doesn't

19  work, then -- then you start considering surgery for -- for both neck

20  and back or thoracic spine, whatever -- whatever the problem is.

21        Q     Right.  So we're -- we're here to talk about the treatment

22  that Alysson received, and I'd like to share my screen.  Can you see

23  this screen, Doctor?

24        A     I can.

25        Q     Okay.  It looks like Alysson first visited you September 14th,

ALYSSON LEDUSVAL TIMONY CARRY
AND TRANSAM TRUCKING, INC.
DEPOSITION OF FERNANDO TECHY, M.D.

```
 1   2023.  Does that sound correct?

 2        A    Correct.

 3        Q    But you told the jury -- you told us a minute ago that you

 4   treat patients in your normal course from the very beginning through

 5   a -- even a second opinion and all on; is that correct?

 6        A    Correct.

 7        Q    Okay.   As her treating physician, is it important to

 8   understand her prior treatment?

 9        A    Yeah, of course.

10             PHILIP MORGAN:  Okay.  I'm going to go ahead and mark this as

11   Exhibit 1.

12             (EXHIBIT 1 MARKED FOR IDENTIFICATION)

13   BY PHILIP MORGAN:

14        Q    Exhibit 1 is going to be your -- the medical records from

15   Allied Orthopedics.  And so there we can see it.  And so you -- you just

16   said a moment ago, it's important for you to understand her prior

17   treatment.  And, in fact, your clinical notes from the very first day

18   that you saw her indicate her past medical treatment; is that correct?

19        A    Correct.

20        Q    And -- and you indicate that she's had chiropractic care,

21   steroid injections; is that correct?

22        A    That is correct.

23        Q    Okay.  I -- I'd like to take a brief look at Alysson's prior

24   treatments so the jury understands it.  First, I think you've talked

25   about this earlier, with patients with this type of injury and pain, is
```



ALLISON DILLASHAW, INDIVIDUALLY,
AND TRANSAM TRUCKING, INC.
DEPOSITION OF FERNANDO TECHY, M.D.

1  there a general standard course of treatment that starts with

2  conservative measures and then progresses?

3      A    Everything -- everything varies quite a bit.  There -- there's

4  no -- nothing is -- there's no cookie cutter in -- in -- in spine surgery.

5  Every -- every patient is -- has its individual treatment.  But overall,

6  let's say there's -- there are no emergencies going on, normally we start

7  with physical therapy, oral medication, and then injections, then

8  rhizotomies, then surgeries.

9          Of course, if they have a neurological deficit or the pain is

10  too intense, sometimes we act a little faster and, you know, we -- we

11  skip some steps to -- to surgery sometimes if -- if the -- the problem

12  is too severe or -- or as I said, there's -- there's instability in the

13  spine and there's a neurological compromise.

14      Q    So are -- are physical therapy or chiropractic sessions

15  considered standard conservative care for a car crash victim?

16      A    They are standard, yes.

17      Q    All right.  What is an MRI?

18      A    MRI is an imaging modality test.  It doesn't use X-rays

19  like -- like most other imaging tests.  It -- it uses an electromagnetic

20  field.  And what it does, it aligns your -- the atoms of your body in a

21  way that generates images.  It's probably the most common used and the --

22  and the best image to -- to look at diseases or trauma of -- of the

23  spine.  So I would say the most common test order.

24      Q    Okay.  So what does it help the treating doctor to see?

25      A    Oh, we're able -- we're able to see the bone, the disc, the

ALYSSON LELESMAY v. TRGC, INC.
AND TRANSAM TRUCKING, INC.
DEPOSITION OF FERNANDO TECHY, M.D.

1  ligaments, the nerves, if there's anything, you know, impinging on it,

2  if there's fractures, how old the fractures are.  Yeah, it's a very

3  useful test.  It -- it gives us a clear idea of what's going on.

4       Q    Is -- is an MRI typical type of imaging that would be ordered

5  in dealing with a car crash victim experiencing pain?

6       A    I -- I think it's very common to be ordered, yes.

7       Q    Okay.  And Alysson, in fact, had some MRIs done that you --

8  you've taken a look at, correct?

9       A    That's correct.

10           PHILIP MORGAN:  Okay.  I'll go ahead and mark as Exhibit 2,

11  this cervical MRI.

12           (EXHIBIT 2 MARKED FOR IDENTIFICATION)

13  BY PHILIP MORGAN:

14       Q    Doctor, I'm going to zoom in.  In the picture on the left of

15  the screen, does it appear that this is an MRI image taken of -- from

16  Alysson's neck on September 9th, 2023?

17       A    Correct.

18       Q    Okay.  And if we zoom back out, does this colorized version

19  on the right accurately reflect the -- a blown-up version of the original

20  MRI?

21       A    Yeah, I would say so.  Yeah.  It's -- it's -- it makes it

22  easier for the -- for the layman person to -- to understand and see.

23       Q    Does this colorized version help you explain to the jury the

24  injuries that Alysson suffered and the pain she's experiencing?

25       A    Yes.



ALISSON LECESMAR, ET AL. VERSUS MINT3
AND TRANSAM TRUCKING, INC.
DEPOSITION OF FERNANDO TECHY, M.D.

1      Q      Would this demonstrative help the jury understand the anatomy

2  that we're going to be discussing?

3      A      Yes.

4      Q      Okay.  Can you give us a brief anatomy lesson of what we are

5  looking at here with the -- the discs in the spine?

6      A      Yeah.  So -- so this is -- this is a sagittal cut.  We call

7  it a sagittal cut, just think that a -- I -- I tell the patients, imagine

8  a ninja comes and chops you with a sword just down the middle and then

9  turn -- each half of you and looks right into the half.

10         The -- the -- the -- the part to the left of the picture will

11  be your mouth.  And then the -- the -- the right of the picture will be

12  the back of your head.  So you're looking into the spinal cord.  That --

13  that cord going down in gray matter, it's their spinal cord coming from

14  your brain going all the way to your, you know, giving out nerves to

15  your arms and legs and makes -- making you move, making you feel, and

16  giving you pain -- pain and temperature sensation.

17         The -- all these little squares in the front that you see on

18  the anterior side are the -- are the bones, are the -- are the -- your

19  vertebral body.  So you see, they're numbered from C2, 3, 4, 5, 6, and

20  7.  There's seven in the neck.  And then you start your thoracic spine,

21  which is your -- your -- your thoracic cavity, and then you have 12 over

22  there.  And then you have five in the lumbar spine.

23         In between each two bones, you have a disc.  That is the

24  cushion so you're able to move.  You're able -- you're not like a stick

25  person.  You can move each disc when you're healthy -- measure -- moves

ALISSON LEDESMA, ET AL. VERSUS GMTS
AND TRANSAM TRUCKING, INC.
DEPOSITION OF FERNANDO TECHY, M.D.

 1  about eight degrees of range of motion.  So once you add eight degrees
 2  per each one of them, you're -- you're able to bend 90 degrees.  You're
 3  able to bend almost 180 degrees if you're flexible at -- at your waist
 4  with the help of your hip, of course.  So eight degrees per disc.  And
 5  the discs are extremely commonly injured in -- in accidents or trauma.
 6  Because as the -- the -- the -- the -- the energy comes through --
 7  through the -- the spine, there's usually, we'll call it the whiplash.
 8  You know, there's some extension, some flexion of your neck and your low
 9  back, and those cushions get -- they get pretty much squashed between
10  two hard bones.

11          Two things will happen.  Either the bone will break, which is
12  less common, or the little disc will -- will burst the annulus on the
13  outside.  And we call -- and the -- and the inner portion herniates.
14  Herniation means it's a tissue in your body that is where it's not
15  supposed to be.  And that being said, is that those -- those pieces of
16  disc now are behind the limit of the bone and -- and they shouldn't be
17  there.  So that's why it's called herniation.

18          The problem is the neural structures.  The nerves are passing
19  right behind it.  And when that herniates and touches the nerve, it
20  causes this irritation on the nerves that usually generates a lot of
21  pain.  Just the disc rupturing by itself without touching the nerve also
22  causes pain because there's terminal endings of nerves into the disc.
23  So they -- they hurt.

24          So basically, that's this.  You got a trauma, you -- you --
25  the disc blows up in a -- in a -- a -- a certain part of it extravasates



ALLISON LEDESMA V. TERRY MORRIS
AND TRANSAM TRUCKING, INC.
DEPOSITION OF FERNANDO TECHY, M.D.

1  from -- from that contained segment and creates the herniation.   And
2  that irritates the -- the -- the disc, irritates the bone, irritates the
3  nerves themselves, the spinal cord, everything in the area.

4       Q    So, Doctor, I really appreciate that long answer.   I'll
5  probably -- opposing Counsel may ask me to do a little bit more of a
6  question and -- and -- and answers.   And so I'd like to go back to a few
7  things that you said there to break it up so that the jury -- that the
8  jury understands, if that's okay.

9            So we're -- we are looking at a picture of Ms. Ledesma's neck;
10 is that correct?

11      A    Correct.

12      Q    Okay.  And the -- the C2, the C3, the -- the -- the C4, those
13 are -- what are those?

14      A    Those are the bones.

15      Q    Those are the bones.  And -- and what is -- sits in between
16 the bones?

17      A    The disc.

18      Q    Okay.  And what does the disc -- how -- what does the disc
19 do?  What is its function between the bones?

20      A    It's a little cushion between the bones.  And so it's shock
21 absorbent, and it's a -- it's a -- it's pretty much a joint.  So you
22 move -- you move through it.  So it makes you move.

23      Q    And if a disc becomes out of place, what do we call that?

24      A    A herniated disc.

25      Q    Okay.  And does Ms. Ledesma show that she has multiple

ALISSON LECLAIRE, ET AL. V. CUONG NGUYEN
AND TRANSAM TRUCKING, INC.
DEPOSITION OF FERNANDO TECHY, M.D.

```
1    herniated discs?

2         A    She does.

3         Q    Okay.  And -- and how can a herniated disc affect the patient?

4         A    So it can -- it can give the patient pain from the simple

5    fact that the -- the disc wall ruptured.  It's pretty much as if having

6    a -- a -- a -- a laceration, a tear in your skin, and the tissues from

7    inside are bulging out.  So that cut on the skin, which just transported

8    to the disc, that will hurt.

9         Now the structures that are coming from inside, they come out

10   and they pinch nerves that are passing behind.  So that will give you

11   the nerve irritation type of pain.  So those -- those types of pain.

12   And then the -- the facet joints, which are the two pillars in the back

13   of the spine, as the disc is not functioning properly, now the facets

14   in the back get overload.  Now you -- you develop facet pain.  So it's --

15   it's a whole segment situation that happens there.

16        I -- I -- I like to tell the patient almost like a -- like a

17   car that has a flat tire.  You have a problem from the flat tire, but

18   if you leave it that way and you keep running, you're going to start

19   getting balance problems with the -- with the suspension, with the other

20   tires, with the -- with the -- with the whole structure of the car.  So

21   in my opinion, it needs to be balanced again so you have good posture

22   and good function.

23        Q    And you mentioned that that was a sagittal view.  There's

24   another view that an MRI can take.  What is that called?

25        A    That -- I think you're referring to the axial view.  That's
```

1    the -- that's the other important one that we always look.

2             PHILIP MORGAN:   Okay.   I'm going to go ahead and mark as

3    Exhibit 3, the axial view.

4             (EXHIBIT 3 MARKED FOR IDENTIFICATION)

5    BY PHILIP MORGAN:

6         Q    And, Doctor, does this appear to be a colorized version of

7    the actual -- axial view of Ms. Ledesma's herniated disc at C5, C6?

8         A    Yeah.   Yes.

9         Q    And can you just briefly explain what -- what we're seeing

10   here?

11        A    Yeah.   So this is the axial cut.   So to -- for people to

12   understand, like first ninja cuts you like this, now ninja's going to

13   come chop your head off like that.   Once it cuts the -- the head off,

14   you're going to look right down into the hole.   And you see in the --

15   the very center is your spinal cord, that -- that -- that gray structure

16   that looks -- looks like a -- a bean.   Around it you have the sac, which

17   is full -- full of water.   We call it the CSF, the cerebral -- cerebral

18   spinal fluid, which is basically water.   That protects your spinal cord.

19   And then it moves inside the sac.

20             In front of it, you have the disc.   So you -- you cut right

21   through the disc level, and that is the C5-6 disc.   So you're -- you're

22   looking in between the bone number five and the bone number six.   That's

23   the disc C5-6.   As you can see, that disc has ruptured and more to the

24   right, it bulges back.   It displaces the spinal cord.   It deforms the

25   spinal cord.   And it takes the space of the right side, we call the

ALISSON LEDESMA v. TERAS MINTS
AND TRANSAM TRUCKING, INC.
DEPOSITION OF FERNANDO TECHY, M.D.

1  lateral recess.  And that -- therefore, that -- that will cause you pain,

2  nerve irritation most likely.  It may not, but in her case, it did.

3          PHILIP MORGAN:  I think I'll mark as Exhibit 4, the lumbar.

4          (EXHIBIT 4 MARKED FOR IDENTIFICATION)

5  BY PHILIP MORGAN:

6      Q     And, Doctor, what are we looking at on this -- on this last

7  Exhibit 4?

8      A     Same thing, is that's the sagittal cut of the lumbar spine.

9  So analogous to -- to the neck, this is the same thing, but done in your

10 low back.  You have the bones number from L1 to L5.  That's lumbar one

11 to L -- to lumbar five.  And the very last one, the -- that big triangle

12 is the sacral one.  That's your first -- we call it S1.  That's your

13 sacral bone, your -- your -- that will -- will give origin to your

14 tailbone once it keeps going.

15         Same -- same way, you got the disc in between.  They do the

16 exact same thing as they do in the cervical spine.  And then you got the

17 neural structures passing behind it.

18     Q     And Ms. -- as -- as we discussed, Ms. Ledesma had two sets of

19 MRIs done throughout her course of treatment; is that correct?

20     A     That is correct.

21     Q     One was in -- in 2022 and the other one was in 2023, right?

22     A     Correct.

23         PHILIP MORGAN:  And I want to take a look.  I'm going to go

24 ahead and mark as Exhibit 5, origin MRI.

25         (EXHIBIT 5 MARKED FOR IDENTIFICATION)

ALISSON LECESNE, ET. AL. VS. GITHENDS
AND TRANSAM TRUCKING, INC.
DEPOSITION OF FERNANDO TECHY, M.D.

1   BY PHILIP MORGAN:

2        Q     Right.  We can see that this was the MRI from 05-11-2022.

3   And this is a radiologist report; is that right?

4        A     That's correct.

5        Q     And a radiologist, that's a doctor that reads these types of

6   images for a living?

7        A     Yes.

8        Q     And he reported at L4, L5 a three millimeter disc protrusion

9   with a superimposed five millimeter right foraminal annular fissure.

10  Can you explain what the annular fissure is?

11       A     So the -- the disc -- the disc, it's composed by two parts.

12  The outer part is the annulus, and the inner part is the nucleus, like

13  a cell, the nucleus of the cell.  So the nucleus is more like -- like a

14  gelatin, like a -- a slime type of material.  And the annulus is just

15  fibrous tissue.  It looks like a tendon, it's very -- very sturdy and --

16  and tough.

17             So the annulus contains the nucleus, which is pretty much a

18  gel.  And the moment you get hurt, the gel is just a gel.  You know, it

19  doesn't break.  But the annulus, it -- fissure -- fissure is like a

20  little cut, a -- a -- is an incontinuity on -- on the -- almost like a

21  tire, has a radial property.  The moment you -- you blow up a piece of

22  the tire, you -- you lose that radial property.  So it can't really, you

23  know, turn on itself anymore.  It -- it doesn't have that power to --

24  to sustain weight anymore.  Same happens to the disc.  You -- you lose

25  that radial power by -- by the fissure on the -- on the -- on the annulus

 1  of the outer part.  And then you -- then you have all this pain, you

 2  know, and the extravasation of -- of the nucleus.

 3          PHILIP MORGAN:  Let me go ahead and mark this as Exhibit 6

 4  and share my screen again.

 5          (EXHIBIT 6 MARKED FOR IDENTIFICATION)

 6  BY PHILIP MORGAN:

 7      Q    Doctor, is this a -- a -- an accurate representation of an

 8  annular tear that you just talked about?

 9      A    Yeah, that's -- that's what we talked about.  You -- you see

10  the tough structure on the outside?  You see on the -- the -- the

11  posterior left area there?  It's right if you're looking, but if you're

12  from the back, it's -- it's the left.  We'll call that the left side.

13  And then you see the -- the gel-like structure in the center?  That's

14  the nucleus.  So the moment you have that fissure, it may just bulge out

15  or that -- that nucleus may extravasate and pinch the -- those nerves

16  that are passing behind it.

17          PHILIP MORGAN:  And I'd like to go ahead and mark as Exhibit

18  7, the MRI -- Houston MRI records.

19          (EXHIBIT 7 MARKED FOR IDENTIFICATION)

20  BY PHILIP MORGAN:

21      Q    And this is the radiologist report from an MRI on September

22  9th, 2023; is that right?

23      A    Correct.

24      Q    And if we look at it, at L4, L5, just as we saw in 2022, it

25  notes that there's an annular tear or fissure again, correct?



ALYSSON LEDESMA v. TERRI MINTER
AND TRANSAM TRUCKING, INC.
DEPOSITION OF FERNANDO TECHY, M.D.

1      A      Correct.

2      Q      So that injury didn't heal over time; is that fair?

3      A      Oh, it's still there.

4      Q      I'd like to get back to the -- the treatment that Ms. Ledesma

5  had.  She went under -- underwent physical therapy.  After that, she

6  went to Origin Spine and had a C5, C6 cervical right facet block on 06-

7  06-2022.  And let's just take a look at the -- while you're explaining

8  it, let me do -- let me do this.  Let me ask a better question.  I'm

9  going to start over.

10             So, Doctor, I'd like to get back to the treatment that Ms.

11  Ledesma had in June -- on June 6th, 2022, she had a right facet block.

12  Can you, looking at the colorized MRI, explain what that is?

13      A      Well, you don't -- you don't see the facets on this cut

14  because they're a little to the side.  But they would be in the --

15      Q      Hang on.

16      A      -- maybe on your -- on your -- yeah, on your -- on your --

17      Q      I'm going to interrupt.  Is this a better way to look at it?

18      A      Yeah, you can see the facets here.  Yeah.

19      Q      Let -- let me -- so let me -- let me ask a -- a better,

20  cleaner question and answer so we can -- because we'll -- we'll cut --

21  we'll -- we'll edit this.  After physical therapy didn't help, Alysson

22  started with a series of injections, and she had a C5, C6 facet block

23  on 06-06-2022.  Can you explain, looking at this picture, what -- what

24  that is?

25      A      So it's a block.  It's -- it's to treat pain that's been

ALISSON LEDESMA, ET AL. VS. CINCINNATI
AND TRANSAM TRUCKING, INC.
DEPOSITION OF FERNANDO TECHY, M.D.

1   generated by the facet joint.  And also, in -- in -- in -- in

2   continuation, the pain that's been generated by the disc and so on.  The

3   facets are the two joints as we talked about before.  They're located

4   on the two posterior aspects of the spine.  If you see here, if you look

5   at this tan or beige type of part of the drawing, that is -- that is

6   bone -- bony structure.  So it comes from the back.

7        Q    Is it right here?  Is it right here where I'm circling?

8        A    Correct.  That is a facet joint.  The -- the joint itself

9   is -- is the -- is the hollow spacing between the two bones.  So you got

10  the bone coming from the front, the bone coming from the back, the joint

11  is in the middle.  So that's your facet joint.

12           PHILIP MORGAN:  Go ahead and mark this as Exhibit -- Exhibit

13  8.

14           (EXHIBIT 8 MARKED FOR IDENTIFICATION)

15  BY PHILIP MORGAN:

16       Q    Doctor, we're -- we're looking at Exhibit 8 here.  Is this an

17  accurate representation of what a cervical facet joint injection is?

18       A    Yeah, that is perfect drawing.  So just -- just a different

19  angle, but shows you the little -- the little joint between the two

20  bones, the -- in -- in that case, the C5 and the C6 bone.  In between,

21  you're going to have a joint.  You have the disc in the front, and you

22  have the two facets in the back, one on the right and one on the left.

23  And yeah, the -- the -- the -- the -- the doctor, the surgeon, they --

24  they insert medicine into that joint to -- to cut down inflammation,

25  alleviate pain, and so on.

ALYSSON LECLENAIR, ET AL VS GCR TIRES & SERVICE
AND TRANSAM TRUCKING, INC.
DEPOSITION OF FERNANDO TECHY, M.D.

1    Q    In -- in -- and this injection is -- is not just like a COVID

2    or flu shot, right?  This -- is this an -- a needle stuck into someone's

3    spine?

4    A    Correct.  That's -- that's way deeper than the -- than the

5    vaccination.

6    Q    Are there -- are there some risks along with these facet joint

7    injections?

8    A    Yeah, there's risks.  Risks like -- like anything you do in

9    medicine, the risks of, you know, infection, bleeding, damage to the

10   structures that are around the facet joint.  To name a few very important

11   structures are, you know, your spinal cord, your nerves that are exiting

12   to your arm or to your leg, depending which level you are, the arteries,

13   you know, vertebral artery and -- and so many important vessels that are

14   around.  Yeah, so it's very -- very delicate and very precise procedure

15   to be performed.

16   Q    Before a patient undergoes such an injection and before a

17   doctor performs one, I mean, do they weigh the risks and -- and benefits

18   and take this calculus seriously?

19   A    Of course.

20   Q    And then on that same day, on June 6, 2022, Alysson had an

21   L4, L5 lumbar facet block?

22   A    Correct.

23   Q    And just to -- to help the jury, that's going to be an -- an

24   injection in the area where she had the herniated disc in her lower back;

25   is that correct?



ALLISON LEDESMA V. TERRY CHANTS
AND TRANSAM TRUCKING, INC.
DEPOSITION OF FERNANDO TECHY, M.D.

1      A     Same level, yes.

2      Q     Okay.  And is this the same type of -- when we're talking

3  about the -- the facet injections, these would -- between the lumbar and

4  the cervical, are they the same type of injection?

5      A     They're the same type, yeah.

6      Q     Okay.  And then she gets another set of injections on 6-10,

7  only these are on the left -- the left side.  Can you explain the

8  difference between the left and the right side and why the two sets of

9  injections?

10      A     It's -- it's more -- I'd say it's more physician preference.

11  I personally do both in the same day.  Some physicians do separate days.

12  I think it's just -- just preference that some -- they -- they -- they

13  may think it's too much to do both at the same time, or -- or the patient

14  prefers to do one and then another one.  It -- it's just personal

15  preference.

16           PHILIP MORGAN:  I'd like to take a look -- we'll go ahead and

17  mark this as Exhibit -- Exhibit 8?  I'd like to take a look at this,

18  Origin Spine.  Go ahead and mark as Exhibit 9 the records from Origin

19  Spine.

20           (EXHIBIT 9 MARKED FOR IDENTIFICATION)

21  BY PHILIP MORGAN:

22      Q     Doctor, we -- we're looking at the -- the medical records

23  from Origin Spine, and this appears to be a follow-up.  And we can see

24  that on 6-6, we had the -- the right side injections on 6-10, we had the

25  left side injections and looks like Ms. Ledesma is following up on June



ALISSON LEDESMA, ET AL. V. RGM CONTRACTS
AND TRANSAM TRUCKING, INC.
DEPOSITION OF FERNANDO TECHY, M.D.

1   24th.  She notes that the injections helped a little bit, but she's still

2   reporting pain.  Is that to be expected or surprising?

3        A    No, not necessarily.

4        Q    Okay.  Why is that?

5        A    I've -- I've seen many -- many that -- I -- I -- I would say

6   that's probably the most common answer.  You know, they help to some

7   extent, but rarely -- rarely I see them get perfect with one series of

8   injections.

9        Q    And -- and then looking at that same -- that same record,

10  she's recommended for another injection, but I want to discuss the --

11  the type here.  And can you just tell us what the procedure that she's

12  recommended for is before so I don't butcher the name?

13       A    Oh, it's lumbar transforaminal epidural steroid injection on

14  the right side, L4-5.

15       Q    Okay.  And how does that differ from the injections that she

16  just had previously?

17       A    It -- it's a slight different technique.  So instead of going

18  into the joint, now you're going a little more the inside and you're

19  putting into the little hole, the medicine in the hole that the nerve

20  comes out to go to your leg.  And that is expected to go into the --

21  there -- it's called epidural.  Most -- most people have heard of an

22  epidural injection.  Epidural relates to the -- to the space, to the

23  sites where the injection is given.

24            So it's -- epidural space is -- is the space right above that

25  sac that covers the nerve that's full of water.  So you put the medicine

ALISSON LEDESMA, ET AL VS. TRANSAM TRUCKING,
AND TRANSAM TRUCKING, INC.
DEPOSITION OF FERNANDO TECHY, M.D.

1   on top of that -- of that sac, hoping it will calm down the inflammation

2   on the nerves.  So it's -- it's a slight different technique than the

3   first one.

4       Q    And -- and the records show the same thing, some improvement,

5   but she's still -- she's still having pain.  Again, is that surprising

6   to you?

7       A    I mean, not necessarily.  Unfortunate, but -- but not --

8   doesn't surprise me, as these things may -- may be difficult to treat.

9       Q    And then looking back at the same record, just to orient --

10  just to orient ourselves.  We're look -- now looking at her treatment,

11  her -- oops -- her preoperative from 07-25-2022.  Again, we see the facet

12  blocks, then we see the transforaminal epidural steroid injection.  And

13  then it appears that Ms. Ledesma is getting another injection -- type

14  of injection.  This one is a lumbar medial branch block.  Can you explain

15  how that differs from the prior injections?

16      A    The -- the medial branch block is -- it -- it's a variation

17  of the facet injection.  They're very similar.  Back -- back in the day,

18  they thought you needed to do a -- an injection inside the joint, but

19  those joints are very difficult to get in.  It -- it's -- it's dubious

20  if you -- if you're -- if you're ever in them on -- on an X-ray.  So the

21  medial branch is the nerve that innervates that joint.

22          So studies were done and they figure out that if you block

23  the nerve or you put the needle in the joint, the results were fairly

24  the same.  So the technique kind of changed a little bit.  And so in my

25  opinion, the medial branch block and the facet joint are essentially the

ALYSSON LEDESMA, TEXAS MUTUAL
AND TRANSAM TRUCKING, INC.
DEPOSITION OF FERNANDO TECHY, M.D.

1    same -- the same procedure, just -- just different nomenclature.

2          And -- and you -- one may argue one goes the medicine more in

3    the joint, one go more in the nerve.  But if you look on, like Blue

4    Cross, Aetna, Medicare, the CPT code, that's the code that you use to

5    get reimbursed for -- for procedures, the facet injection and the medial

6    branch block, they -- they have the same CPT code and they pay the same.

7          So for the great payer, the -- the big payers of this country,

8    the government, they're -- they're considered the same procedure and

9    pays the same and have -- have the same code.

10   Q     Okay.  Then going -- going back to Alysson's records.  Now

11   we're up to August 16, 2022.  Again, we see the numerous injections that

12   we've talked about.  And this time, we scroll down, we see that she's

13   recommended for a medial branch radiofrequency ablation.  Can you help

14   us understand what that procedure is?

15   A     So -- so that is the next step.  You know, if you -- you --

16   you -- you do the epidural.  You -- you do the MBB/facet injection.

17   There -- there's two types of facet injection.  One, what's called a

18   diagnostic.  One is a therapeutic.

19         The diagnostic is done only with lidocaine, just -- so you

20   just numb it up to see which facets are hurting.  And then if -- if

21   that's the case, you find which ones they are, because the pain goes

22   away temporarily.  Then you go back and you do the rhizotomy or RFA,

23   radiofrequency ablation or RFTC, radiofrequency thermal coagulation.

24   You -- you'll find these terms interchangeable.  They're all the same.

25         Basically now you're going there more definitively, and

ALLISON LECINSKA, TERRI MINTS
AND TRANSAM TRUCKING, INC.
DEPOSITION OF FERNANDO TECHY, M.D.

1  you're putting a little probe and you're burning the nerve that

2  innervates the facet joint.  And that is -- you can call it nerve

3  ablation, facet ablation, facet thermal coagulation, radiofrequency

4  ablation, rhizotomy.  It's all the same.  So it's a -- you're basically

5  burning the nerves that are hurting in the facet.

6         What will happen in about the -- the space of time of a year,

7  maybe nine months to a year, your body will form new nerves to that.

8  They're very terminal.  So it's not that you're going to be incensed

9  there forever.  Hopefully by when -- with this time that you're not

10  feeling pain, you're able to do therapy.  Your -- your disc is able to

11  regenerate.  You're able to -- to get back in shape.  You're able to get

12  your posture right.  And hopefully, when the nerves return, the pain

13  doesn't return with it.  It may return, it may not.

14         But that's the -- that's the goal of this treatment.  The --

15  the burning of the nerves, we call it, in a more layman term.

16         PHILIP MORGAN:  All right.  And just to help the jury

17  understand, mark this as Exhibit 10.

18         (EXHIBIT 10 MARKED FOR IDENTIFICATION)

19  BY PHILIP MORGAN:

20     Q   This is a picture of a -- of a -- of an RFA.  And is -- is

21  the burning done through the sticking of an electrode into the nerve and

22  the spine?

23     A   It can -- there's different ways you can do it.  You can do

24  that through a needle.  And then you put the electrode through the needle

25  and burn it.  You can then, in an open fashion, if you want to burn a



ALYSSON LECESMAY V. TRANSAM TRUCK'N INC.
AND TRANSAM TRUCKING, INC.
DEPOSITION OF FERNANDO TECHY, M.D.

```
 1  broader, bigger area, you can do a small incision then -- and then you
 2  put your probe there with direct visualization under a microscope or
 3  endoscope.  And then -- and then you burn the nerve that way.  Fairly
 4  the same.  The open one is stronger.  You burn a bigger area.  But
 5  clearly, the other one is less invasive and -- and -- and most of the
 6  times it works very well for its purpose.  So that should be -- should
 7  be enough.
 8       Q    And -- and so the radiofrequency ablations bring us through
 9  her treatment in September of 2022.  And just have a couple questions.
10  Based on your training, experience, and what you know of Alysson's
11  condition, is it your opinion that, within a reasonable degree of medical
12  probability, that the medical treatment Alysson received, including the
13  facet  joint  injections,  medial  branch  block,  and  radiofrequency
14  ablations were medically necessary?
15       A    Yes.
16       Q    Okay.  Based on your training and experience, is it your
17  opinion that, within a reasonable degree of medical probability, that
18  the medical treatment Alysson received was in -- through September 22,
19  2022, was needed because of the crash on April 7th, 2022?
20       A    Yes.
21       Q    Based on your training, experience, and what you know of
22  Alysson's condition, is it your opinion that, within a reasonable degree
23  of medical probability, that Alysson's injuries were caused by the crash
24  on April 7, 2022?
25       A    Yes.
```

ALYSSON LEDESMA vs. TRICAN NORTH AMERICA
AND TRANSAM TRUCKING, INC.
DEPOSITION OF FERNANDO TECHY, M.D.

1    Q    Okay.  And you testified a moment ago that ablations can --

2   tend to last nine months to a year.  Did I understand that correctly?

3    A    That is correct.

4    Q    And so if we look back actually at Alysson's treatment summary

5   here, it's about a year, and she goes back to a Dr. Lee (phonetic) with

6   Allied Medical Centers for reporting -- reporting the pain's returned.

7   And -- and is it -- is that to be expected from the procedures that

8   she's had?

9    A    I -- I -- I mean, it -- it can.  I -- I -- I wish it had gone

10  the other way.  I -- I wish she wasn't having recurrence of the pain,

11  but -- and that it can -- it can definitely go that way.  But some cases,

12  as her case, you know all these things and about a year later, the pain

13  returns.  And -- and that's unfortunate.  And so, it -- it doesn't --

14  doesn't surprise me.  We see this all the time, and these injuries can

15  clearly come back.  And then you have to -- you have to figure out what

16  you're going to do next.

17   Q    And then Dr. Lee ordered another MRI, and he referred Alysson

18  to a neurosurgeon.  Are you that neurosurgeon?

19   A    I'm not -- I'm not aware.  She referred to -- to me, correct?

20   Q    Correct.

21   A    I'm an orthopedic spine surgeon, but -- but yeah, we do the

22  same as neurosurgeon, but just to be correct on the affirmation.

23   Q    I -- I appreciate that.  So Dr. Lee refers Alysson out for

24  further treatment, and then Alysson comes and sees you first time on

25  September 14th, 2023?



ALYSSON DECLMARK   TECHY AGAINST
AND TRANSAM TRUCKING, INC.
DEPOSITION OF FERNANDO TECHY, M.D.

1      A    That's correct.

2      Q    Okay.  Before we dive into Alysson's treatment, do you have

3  to determine whether a patient is being truthful when assessing them?

4      A    Yeah, of course.

5      Q    How do you determine whether a patient's being truthful about

6  their pain while you're assessing them?

7      A    I -- I think that nobody comes to a spine surgeon telling

8  they're hurting if they're not.  You know, just -- it would be -- and

9  then agreeing to go over all these invasive procedures if -- if they

10 don't need it, I think it's -- you would -- you would -- you -- you

11 would need to be, you know, doubting them from a psychiatric standpoint,

12 which is extremely rare to see.  I -- I probably -- I -- I don't think

13 in a 20-some year career I've had -- I've -- I've had a single person

14 that I doubted that can -- comes to -- to -- to, you know, telling me

15 that they want things to be treated that they don't need.  I -- I -- I

16 just haven't encountered.

17     Q    So the -- the fact that -- if I understand your -- your answer

18 correctly, is the fact that Alysson underwent consistent treatment from

19 the crash, including various invasive injections, and she returns to a

20 spine surgeon, you know, about 18 months after the crash, is that a

21 strong indication that the pain she's feeling is real?

22     A    Yeah, I believe it is.  I have no -- I have no reason to --

23 to think it's not.

24     Q    Is putting your hands on the patient an important -- important

25 part of the process in determining whether they're faking their symptoms

ALYSSON DECLMAVO, ET AL VS. TRANSAM TRANS
AND TRANSAM TRUCKING, INC.
DEPOSITION OF FERNANDO TECHY, M.D.

1   of pain?

2        A    It -- it's important to examine them, I would say so.

3        Q    Okay.  And I think you answered this, but based on your

4   experience, any reason to believe that Alysson was faking her complaints

5   of pain?

6        A    I don't think she was.

7        Q    Okay.  And would the defense's paid testifier, who neither

8   talked to nor put his hands on Alysson, would he have the same opportunity

9   to determine Alysson's truthfulness for her complaints of pain as you

10  did, her treating physician?

11       A    I think once you're a treating physician and you're able to

12  see the -- the patient in person, you -- you have an advantage to have

13  a real feel of the situation than if you're only examining records.

14            PHILIP MORGAN:  I'm going to mark as Exhibit 11, your records.

15            (EXHIBIT 11 MARKED FOR IDENTIFICATION)

16  BY PHILIP MORGAN:

17       Q    And -- and this is the clinical note from your first visit --

18  visit with Alysson on September 14th; is that -- is that correct?

19       A    Correct.

20       Q    And we scroll down and you -- you did a physical examination

21  of her.  Can you -- can you help us understand what you saw in terms of

22  positive facet loading test and radiating pain?  Can you help us

23  understand what the physical examination revealed?

24       A    Yeah.  So it was basically you test the range of motion of

25  the joints, the range of motion of your neck and back, the -- the -- the

ALYSSON LEDESMA v. TRANSAM TRUCKING, INC.
AND TRANSAM TRUCKING, INC.
DEPOSITION OF FERNANDO TECHY, M.D.

```
1   strength, the sensation in the arms and the reflexes, right?  So -- so

2   basically, I believe her strength and her sensation were fine.  Her

3   reflexes were fine.  And she had, as I moved her neck and as I pressed

4   her facet joints, most of her pain was from C4 to C7 and L4-5 in the --

5   in the bottom.  There was some radiation to the buttocks, both her

6   thighs, a little bit to her arms.  But the main thing was her pain.  And

7   the -- the -- the pain in the neck and in the back, we call the axial

8   pain, the pain that comes from discs, from facets.  So that's what I

9   determined by examining her and -- and hearing her story.

10      Q    And just so the jury understands to orient us -- orient

11  ourselves, we're nearly a year and a half after this crash, and Alysson's

12  still reporting pain in her neck and back?

13      A    Correct.

14      Q    Okay.  Look at -- looking back at your notes, you do look at

15  the imaging studies and -- and we have -- we have looked at those earlier;

16  is that correct?

17      A    Correct.

18      Q    Shows herniated discs at C4, C5.  It shows a herniated disc

19  at L4, L5, correct?

20      A    Correct.

21      Q    Okay.  And then the assessment section, you know, it's

22  cervical pain, lumbar spine pain, radiculopathy of the cervical and

23  lumbar spine, muscle spasms of the cervical and lumbar spine, and facet

24  pain of the cervical and lumbar spine.  Is it fair to say that, in this

25  section, you've identified the injuries that Alysson is suffering from?
```



ALYSSON LECESNE V. TERRI CANTU
AND TRANSAM TRUCKING, INC.
DEPOSITION OF FERNANDO TECHY, M.D.

1       A    Correct.

2       Q    And again, based on your education and experience, can you

3  say, within a reasonable degree of medical probability, that these

4  injuries were caused by the crash on April 7th, 2022?

5       A    I believe they were.

6       Q    Alysson was just 21 at the time of the crash.  And now she's

7  23 when she's visit -- visiting you.  Is this young to be suffering from

8  chronic neck and back pain?

9       A    It is.

10      Q    All right.  Are you aware of any other events in her life

11 other than the crash that could account for this chronic pain?

12      A    I'm not aware.

13      Q    Is -- is -- is it important in your diagnostic process in

14 informing your opinion that the crash caused injuries, the fact that

15 Alysson had no neck or back pain before the crash and at such a young

16 age is showing herniated discs and experiencing neck and back pain that's

17 unresolved for 18 months?

18      A    Yeah, of course, very important.

19      Q    Why is that important?

20      A    Because if -- if she was a, you know, a person that before

21 the accident was already going to a doctor, getting a lot of shots for

22 pain and then doing therapy, you know, I would say -- and -- and -- and

23 that -- that doesn't mean those people cannot get aggravated at the

24 accident.  If they -- they have all that, and they -- they -- if you --

25 if you see a -- a change in pattern of the need of that, that's how I

ALYSSON DECLMAN, ET AL. V. TRONG NINH
AND TRANSAM TRUCKING, INC.
DEPOSITION OF FERNANDO TECHY, M.D.

1    go the most.

2              If you -- after -- after a -- a fact, you see a change in the

3    pattern of the -- the care needed, to me that clearly either caused or --

4    or exacerbated.  If she is a young, 21-year-old girl that has never been

5    to a doctor to treat her neck or back, had no back or neck pain, and

6    after a trauma, she needs constant care and several invasive treatments,

7    to me that -- and -- and MRIs showing the injuries that correlate with

8    her physical exam and -- and what she -- she tells you, to -- to me is

9    very -- connects, you know, a lot to the -- the -- leaves me with no

10   doubt that this is caused by that trauma.

11        Q    And Alysson returned to you on December 21st, 2023.  And you

12   recommended that she get another medial branch block from C4 to C5.  Is

13   that the same medial branch block that we -- that she had earlier?

14        A    Yeah, I -- I don't know.  It wasn't me who did the one earlier.

15   But based on the name, I -- I would assume it would be very similar.

16        Q    Okay.  And why are we trying that again?

17        A    Well, she -- she's a 23-year-old girl.  You know, I had the

18   option to, you know, one, leave her alone.  Don't do anything.  Tell her

19   to go take some Aleve and live her life.  But she didn't want to do that

20   because she was in a lot of pain.  Second, I could try those shots again.

21   Third, I could go and, you know, fuse her neck.  Based on her age and --

22   and how the injections helped her, at least temporarily in the -- in the

23   first place, and she was extremely young, I decided to give injections

24   another shot to try to, you know, hopefully I can get this girl better

25   without having to operate on her and fusing her neck and back at age 23.

1    So I thought it was -- it was a valid attempt to -- to try it again.

2              PHILIP MORGAN:  I'm going to mark as Exhibit -- I'm marking

3    as Exhibit 12, you made some recommendations for potential future care

4    for Alysson; is that right?

5              (EXHIBIT 12 MARKED FOR IDENTIFICATION)

6              WITNESS:  Yes.

7    BY PHILIP MORGAN:

8         Q    I'm going to share that screen with you.  And -- and you

9    state -- is this your signature on the bottom?

10        A    Yes.

11        Q    Okay.  And this was back in -- in March of -- of '24, correct?

12        A    Correct.

13        Q    And you state, concerning Alysson Ledesma's future medical

14   care needs as related to her injuries sustained on April 7th, 2022, you

15   recommend the following from a more probable than not standpoint within

16   a reasonable degree of medical certainty.  You -- let's just kind of

17   take it bullet point by bullet point.

18             As we discussed earlier, the injuries you diagnosed her with

19   are cervical, lumbar herniated discs, facet pain, and radiculopathy,

20   correct?

21        A    Correct.

22        Q    And then you recommend more probably than not that she's going

23   to need to go -- undergo three RFA procedures.  And what are those again?

24        A    The RFA is the burning of the nerves.

25        Q    And then you recommend that she's going to need to go --

ALYSSON LECESMAR, TORGRIMSINTE
AND TRANSAM TRUCKING, INC.
DEPOSITION OF FERNANDO TECHY, M.D.

1   undergo medial -- MMBs.  Is that medial branch blocks?

2        A    Correct.

3        Q    And having those then followed by RFAs in her neck, correct?

4        A    That's right.

5        Q    Okay.  Assuming nothing significant has changed in Alysson's

6   medical history since you made these recommendations in March of 2024,

7   is it still your opinion, within a reasonable degree of medical

8   certainty, that this treatment will be needed in the future?

9        A    I believe so.  She's still hurting.  Yes.

10        Q    And based on a reasonable degree of medical certainty, is it

11   your opinion that this future care is needed because of the injuries

12   Alysson suffered as a result of the crash on April 7th, 2022?

13        A    That is correct.

14        Q    And if -- if -- if Alysson gets the -- the treatment that's

15   recommended, is it possible that she, even after that treatment, could

16   still suffer pain in the future?

17        A    It's possible, yes.

18        Q    Can you say within a reasonable degree of medical probability,

19   and that's not a certainty, but it's just a reasonable degree of medical

20   probability that Alysson, because of this crash, is going to suffer some

21   neck and back pain for the rest of her life?

22        A    That's a -- that's a probability.

23        Q    Okay.  And why -- why do you say that?

24        A    Just based on what we've seen so far.  It's a -- it's a girl

25   that had no pain before and, you know, almost a two-year history of --

ALLISON LEDESMA v. TERRI MINTS
AND TRANSAM TRUCKING, INC.
DEPOSITION OF FERNANDO TECHY, M.D.

1    of pain in the neck and back, that -- that gets better temporarily with

2    these procedures and -- and it -- it returns.  So it's kind of a, you

3    know, it's showing itself to us how it -- how it's going to go.

4        Q    And as -- as we noted, Ms. Ledesma was young when the crash

5    happened.  I -- I believe she was just 21 and now she's -- she's 23 when

6    she last saw you.  As she ages, will -- is it your opinion, within a

7    reasonable degree of medical probability, that as she ages, these

8    injuries will get worse?

9        A    Oh, it will, for sure.  Even -- even people with no back or

10   no neck pain at age 20, as we age, we have, you know, higher chances of

11   starting to have back and neck pain.  When you -- when you come out from

12   your 20s with discs that are not 100 percent there, the -- the chances

13   of having problems in old age are -- are much higher than the general

14   population.  No doubt.

15       Q    So is it your opinion that she's going to suffer a -- a --

16   a -- a good degree of future pain and suffering as a result of the injury

17   she sustained in April 7th, 2022?

18       A    It is.

19       Q    Okay.  Doctor, we've been going for about an hour.  I can

20   take a break now.  I actually don't have that much more to finish up.

21   The Defense Counsel may have some questions.  Do you want -- do you want

22   a break, or do you want me to just keep going?

23       A    Let's do a break between you and Defense.

24       Q    Okay.  Fair enough.  Okay.

25       A    If that's okay with you.



ALYSSON LEDESMA, TERGU MINTA
AND TRANSAM TRUCKING, INC.
DEPOSITION OF FERNANDO TECHY, M.D.

```
1        Q     It's good by -- that's good by me.  Essay, he says he's still
2   good to go, so okay.  Just thought I'd ask.
3        A     Okay.
4              PHILIP MORGAN:  Actually, you know what, I'm going to -- I
5   need to use the restroom.  Can we take -- can we take five?
6              ESSAY EDEN:  Yeah, I need to use the restroom, too.  Yeah.
7              NOTARY:  The time is 5:57 p.m.  We are off the record.
8              (OFF THE RECORD)
9              NOTARY:  The -- the time is 6:05 p.m.  We are on the record.
10  BY PHILIP MORGAN:
11       Q     Doctor, is it your opinion, within reasonable degree of
12  medical probability, that the injuries that Alysson has suffered from
13  this crash are permanent in nature?
14       A     Yes.
15       Q     And in fact, we -- we looked at her MRIs and she has a -- a
16  fissure in her -- in her disc that has not healed; is that correct?
17       A     That is true.
18       Q     And -- and she had herniated discs in the imaging in May of
19  2022 and -- and still has herniated discs since September of 2023,
20  correct?
21       A     That's true.
22       Q     None of -- none of those issues have resolved since the crash,
23  right?
24       A     They have not resolved yet.
25       Q     With a patient like Alysson, the type of pain she's
```

1    experiencing, would -- is it possible that the pain could differ day-

2    to-day?

3         A    It's possible.

4         Q    So if -- if she had a good -- she can have a good day or a

5    bad day?

6         A    Yes.

7         Q    Is that common in -- in -- with patients with this type of

8    pain?

9         A    That is the most common to see.

10        Q    So if in some medical records, you know, through two years of

11   treatment, she reports a lower pain or that she's having a -- a -- a --

12   a -- a good day, that doesn't mean that she's healed and -- and is pain-

13   free and any pain thereafter is a result of something else; is that

14   correct?

15        A    That is correct.

16        Q    Okay.  Through your education and -- and experience with

17   treating patients with pain, have you learned how the type of injury

18   suffered by Alysson can impair a person's ability to engage in tasks of

19   daily living?

20        A    They can.  Of course.

21        Q    Can you describe some of the things you've seen in your

22   patients through your experience?

23        A    I've seen, you know, several different and different ways.

24   There's people who cannot continue their jobs in construction, in

25   anything that's physical.  There's people that have pain simply working

ALYSSON LECLAIR vs. TERRI CHITTS
AND TRANSAM TRUCKING, INC.
DEPOSITION OF FERNANDO TECHY, M.D.

1  in a -- in an office sitting for prolonged periods of time.  There's

2  people who cannot, you know, carry their kids.  They -- they cannot go

3  on long hikes.  They cannot participate in sports they used to do.

4  Several -- several limitations.

5      Q    We've discussed Alysson's treatment, and you got to know

6  Alysson.  Within a reasonable degree of medical probability, did the

7  injuries you were treating Alysson for impact her ability to engage in

8  the tasks of daily living?

9      A    I -- I don't have a detail information what she can or she

10  cannot do, but I believe so, because she -- she's a young girl that

11  continues to seek medical treatment to try to get better.  So clearly

12  she -- she's not happy how the way she is.

13      Q    Within a reasonable degree of medical probability, did

14  Alysson's injuries result in a substantial loss or diminution in her

15  ability to engage in tasks or activities for her own benefit or enjoyment

16  beyond just suffering pain?

17      A    I believe so.

18      Q    Within a reasonable degree of medical probability, will

19  Alysson's injuries continue to result in a substantial loss or diminution

20  in her ability to engage in tasks or activities for her own benefit

21  beyond pain into the future?

22      A    I think so.

23      Q    In your opinion, within a reasonable degree of medical

24  probability, was Alysson injured in the crash on April 7th, 2022?

25      A    Yes.



ALYSSON LECLMAR V. TRUCK CENTERS
AND TRANSAM TRUCKING, INC.
DEPOSITION OF FERNANDO TECHY, M.D.

1      Q      Is this opinion based on your actual physical examination of

2    her?

3      A      Yes.

4      Q      Did the imaging that we looked at support your diagnosis and

5    the symptoms that Alysson was presenting to you with?

6      A      Yes.

7      Q      To your knowledge, Alysson had no prior neck or back injuries?

8      A      That's correct.

9      Q      Is the fact that Alysson had no neck or back pain prior to

10   the crash and has been experiencing neck and back pain ever since, does

11   that support your opinion that, within a reasonable degree of medical

12   probability, she was injured in this crash?

13     A      Yes.

14     Q      Do you disagree with Defendant's paid testifier that Alysson,

15   at most, suffered a mere sprain or strain?

16     A      I disagree.

17     Q      Okay.  And why do you disagree with that?

18     A      Usually simple strain and sprains, they -- they resolve in,

19   you know, six weeks to -- to eight weeks.  Pain goes away, and it's not

20   an issue.  They rarely require several injections and nerve burnings.

21   And when you get an MRI, you do not see herniated discs when it's a

22   simple sprain or strain.  If there's a herniated disc, then it's a

23   herniated disc.

24     Q      So is the fact that we have a herniated disc, along with pain

25   in the area of the herniated disc, coupled with the fact that she didn't

1  experience neck or back pain before the crash, is that a strong

2  indication that the injuries she suffered in this crash go beyond a mere

3  sprain or strain?

4      A    Yeah, it's -- it's -- it's visible on -- on -- you can see on

5  image and -- yeah.

6      Q    Defendant's paid testifier, who did not treat Alysson, states

7  that she should have healed in eight to 12 weeks and that interventional

8  injections do not have a role in her care.

9          Do you disagree with that statement?

10     A    Yes.

11     Q    Why?

12     A    Well, I -- I think.  If -- if -- if -- if it was a simple

13  sprain and strain, she would've healed in eight weeks.  I -- I -- I

14  would agree with that.  And -- and the simple fact that this has been

15  going on for almost two years and she's still in pain, that is -- that

16  is another proof that, in retrospect, even that's the best proof in my

17  opinion, that more happened to her than just a sprain and strain.  So

18  she -- she has more issues than that.  That's why she's still in pain.

19     Q    Your goal was to treat Alysson's injuries related to pain and

20  help her, correct?

21     A    Correct.

22     Q    And did the injections provide some relief?

23     A    I believe they did.

24     Q    And your goal is to help Alysson get better in the future,

25  and you believe that she might benefit from further workup, including



ALYSSON LEDESMA v. TERRI MANTZ
AND TRANSAM TRUCKING, INC.
DEPOSITION OF FERNANDO TECHY, M.D.

1    injections in the future, right?

2         A    I think she'll -- she will.  Yeah.

3         Q    You take your ethical obligations to your client seriously?

4         A    Of course.

5         Q    Are you recommending these future injections because, in your

6    opinion and within a reasonable degree of medical probability, this

7    treatment is medically necessary?

8         A    Yeah, of course.

9         Q    Alysson, a 20-year-old with no history of neck or back pain,

10   she's in a crash on April 7th, 2022, and there are no other major events

11   that would cause pain, and ever since the crash, she's reporting neck

12   and back pain.  Is it fair to say that there are really only two

13   explanations.  One, either Alysson is faking or two, her pain and

14   injuries are real, and they're the results of the injuries sustained in

15   the crash?

16        A    I -- I would say, yeah, those are two possibilities.

17        Q    Is there a -- is there a third possibility we're not

18   accounting for?

19        A    Not that I am -- I'm aware of.

20        Q    So to -- to maybe to say it a little bit more directly, is

21   it -- is it fair to say that either Alysson is faking or that she

22   sustained injuries as a result of this crash and needed the medical

23   treatment she's received because of it?

24             ESSAY EDEN:  Objection.  Asked and answered.

25             WITNESS:  Yeah, I think --

ALISSON LECKMAN, ET AL. VS. TERRY MINTS
AND TRANSAM TRUCKING, INC.
DEPOSITION OF FERNANDO TECHY, M.D.

JULY 31, 2024

 1  BY PHILIP MORGAN:

 2      Q    You can answer.

 3      A    -- those are two possibilities.  Yeah.

 4      Q    Okay.    Doctor,  I'd  like  to  briefly  discuss  your

 5  qualifications.  Are you licensed to practice medicine in the state of

 6  Texas?

 7      A    I am.

 8      Q    Is your license in good standing?

 9      A    Yes.

10      Q    Have you ever been licensed to practice in any other states?

11      A    I have.

12      Q    Which ones?

13      A    Ohio, Illinois, Colorado, Wyoming, Kansas, Florida, and --

14  and Texas.

15      Q    Where did you go to medical school?

16      A    I -- I'm from Brazil originally, so that's where I went to

17  medical school.

18      Q    Did you say Brazil?

19      A    Yes.

20      Q    Okay.    After  medical  school,  doctors  usually  complete  a

21  residency, right?

22      A    That's right.

23      Q    What is a residency?

24      A    A resident -- so medical school, you finish medical school,

25  you -- you're a general doctor, right?  And then residency you choose

ALISSON LEDESMA   TRCS MINTS
AND TRANSAM TRUCKING, INC.
DEPOSITION OF FERNANDO TECHY, M.D.

1    the specialty that you want to be.  My case is orthopedic surgery, which

2    is, you know, treats bones and tendons and -- and things like that,

3    fractures.  And, you know, cardiology will treat the heart.  You know,

4    you got the eye doctor, you got the ENT doctor, so that's your specialty.

5    So you -- you do several years of training in -- in that specialty that

6    you want to do.

7         Q    Did you complete a residency?

8         A    I completed two residencies.  I -- I did one in Brazil, where

9    I -- where -- where I finished medical school, and I -- I did an

10   orthopedic surgery residency in Brazil, Sao Paulo, Brazil, but I wanted

11   to move here and I was applying for -- for the -- a spot.  So I -- I

12   finally matched to -- to -- to get a spot to -- to move here.  So I had

13   to repeat a whole five-year residency in University of Illinois in

14   Chicago.

15        Then I got my degree of orthopedic surgeon in -- in Chicago

16   in -- after five years.  And then I decided to do a subspecialty, which

17   was spine surgery.  Then I -- I went to Cleveland Clinic in Cleveland,

18   Ohio, and did a neurosurgery fellowship in spine surgery at the Cleveland

19   Clinic.  And then -- and then I finished my education after that.

20        Q    How long have you practiced in the -- the specialty you just

21   described?

22        A    I -- I finished my fellowship 2011, so that is 13 years

23   practicing on my own.

24        Q    After -- other than the residency, have you completed any --

25   any other training such as board certification?

ALLISON BLECKMAN, TERRELL LEWIS
AND TRANSAM TRUCKING, INC.
DEPOSITION OF FERNANDO TECHY, M.D.

1      A    Yeah, I'm board -- I'm board-certified, yes.

2      Q    Can you explain briefly what board certification means?

3      A    So board certification is -- is -- it's a board of -- of your

4   peers, that all -- they're all orthopedic surgeons, and you have to --

5   it's a test you have to go and pass, and they analyze all your cases.

6   So through the timeframe of two years, every case, every surgery that

7   you do, you got to submit to this board, and they're going to analyze

8   from everything from clinical notes to imaging you ordered, to the

9   surgery you've done, your results, your complications.  And they analyze

10  very thoroughly if -- if it's within the standards of the American Board

11  of Orthopedic Surgeons.

12         And after they analyze that for two years at all the surgeries

13  you've done, you're called for a test, and you do this test.  They go

14  over, they pick 10 cases out of as many as you sent.  And then you got

15  to send all of them, you can't pick.  So they pick 10 of them, and they

16  go over each one of them and they analyze if you're -- if you're -- if

17  you meet the standards of the Board of Orthopedics.  And if -- if you

18  do, you get a certification.  It's valid for 10 years, then you got to

19  redo it.

20     Q    Yours is currently valid?

21     A    Valid, yeah, I -- I -- I passed once and then I -- I retook

22  the certification.  So mine is valid now to 2037.  That's what I needed.

23     Q    Not -- not every orthopedic surgeon's board-certified; is

24  that right?

25     A    That is right.  You're not -- you're not -- example, the state

ALLISON LECLEMAIRE, ET AL. VS. DANA GRAHAM
AND TRANSAM TRUCKING, INC.
DEPOSITION OF FERNANDO TECHY, M.D.

1  will give you a license even if you're not board-certified.  It's not --
2  it's not mandatory to -- to be a doctor.

3      Q      And -- and can you just tell us a little bit about what your
4  practice currently is today?

5      A      Well, I -- I do spine surgery only.  So everything I do is
6  related to spine.  So I -- I -- I basically see adult spine, I'll see
7  some children, but it's very rare.  Mostly, I'd say most of my patients
8  are either degenerative disease.  People are just getting old, and the
9  spine doesn't work as well and we've got to do some things.  And -- and
10  the other types of patients are, you know, trauma.  People get hurt, so
11  they -- they -- they need spine care a little earlier than -- than they
12  would if they -- they were just getting old normally.

13      Q      And do you have any hospital privileges in Houston?

14      A      I do.

15      Q      Where?

16      A      I do -- I do have hospital privileges at -- oh, in quite a
17  few.  It's Royal Oak Hospital, Advanced Diagnostic Eastside Hospital,
18  Eastside Hospital Houston, First Surgical Hospital, you know, two or
19  three surgery centers.  Then I got -- I got privileges in -- in the
20  hospitals in Dallas and in -- in -- in San Antonio as well.

21      Q      And -- and real quick, your -- you said your current practice
22  is spine surgery, but does that include the total treatment of the spine,
23  such as doing the injections and the more conservative care before spine
24  surgery that we talked about earlier?

25      A      Correct.  Correct.  I do -- I do from the -- from the

Created by Skribe | support@skribe.ai                                    46

ALYSSON LEDESMA, ET AL. VS. TRANS CHEM 3
AND TRANSAM TRUCKING, INC.
DEPOSITION OF FERNANDO TECHY, M.D.

1    beginning -- as -- as you said, like, this lady came to me as a second

2    opinion in the middle of her treatment, but sometimes we see patients

3    that are, you know, they just got hurt last week or back pain started

4    two weeks ago.  So we go over the whole, you know, physical therapy or

5    medication.  I -- I do my own injections, you know, epidurals, medial

6    branch blocks, facet blocks, the rhizotomies, and the -- and then I do

7    the surgery, if needed.

8              PHILIP MORGAN:  Okay.  If you can give me -- if we can go off

9    the record.

10             NOTARY:  The time is 6:19 p.m.  We are off the record.

11             (OFF THE RECORD)

12             NOTARY:  The time is 6:19 p.m.  We are on the record.

13             PHILIP MORGAN:  Doctor, thank you for your time today.  I

14   will pass the witness.

15             WITNESS:  All right.  Thank you.

16                            EXAMINATION

17   BY ESSAY EDEN:

18        Q    Good evening, Doctor.  I've got a few questions.  Are you

19   ready to keep rolling?

20        A    Yeah, we can go.  Good evening.

21        Q    Good evening, Dr. Techy.  My name is Essay Eden.  I'm a lawyer

22   for the defendants in Ms. Ledesma's lawsuits.  Where are you right now?

23        A    In Houston, Texas.

24        Q    Good deal.  Did I pronounce your name correctly?  I think I

25   may have because my godfather's last name is Techy, but is -- is that

ALISSON LEDESMA V. TRUCKMOVERS
AND TRANSAM TRUCKING, INC.
DEPOSITION OF FERNANDO TECHY, M.D.

 1 | the proper pronunciation?

 2 |     A    Is that right?  Yeah, yeah, that's -- that's -- that's

 3 | correct.

 4 |     Q    Good deal.  Are you charging a fee for your professional time

 5 | spent here this evening?

 6 |     A    Yes.

 7 |     Q    And who are you charging it to?

 8 |     A    I believe the -- the -- the patient's attorney.

 9 |     Q    Do you know the rate you're charging, sir?

10 |     A    I -- I'm not sure because this is going through Allied

11 | Orthopedics, so I don't know how much they charge exactly.  I -- I -- I

12 | couldn't tell you.

13 |     Q    Did you get a chance to meet with Ms. Ledesma's lawyers before

14 | your deposition today?

15 |     A    I -- I talked to him briefly on the phone before -- before

16 | the deposition.

17 |     Q    You mentioned you have a medical license in the state of

18 | Texas; is that right?

19 |     A    I do.

20 |     Q    When did you receive it?

21 |     A    2021, I believe.

22 |     Q    Prior to that, you had a Colorado license as well, true?

23 |     A    That's true.

24 |     Q    Those other states that you were mentioning earlier during

25 | Phil's cross of you, Ohio, Illinois, Kansas, and Florida, do you hold a

ALISSON LICHSMAN, ET AL. VS. CHINTO
AND TRANSAM TRUCKING, INC.
DEPOSITION OF FERNANDO TECHY, M.D.

1  medical license in those states as well?

2      A    I -- I had licenses, but I -- I -- I -- I believe they're

3  all lapsed at this point because we -- we were going to -- well, Illinois

4  and Ohio is my training that I kept.  And then as I -- I decided I wasn't

5  going to go back, then I -- then I -- I -- I -- I stopped paying the --

6  the dues.  Colorado, it -- it may be still valid, but I'm -- I'm not

7  sure.  I'm -- I'm not planning on renewing it.  In Florida and Kansas,

8  we were going to open clinics in those states at some point in our

9  careers, and -- and then -- but that -- that idea is no longer in -- in

10 question.  So we -- we -- I also let it lapse.

11     Q    So today you're comfortable with testifying that your medical

12 practice is exclusive to the state of Texas, correct?

13     A    That is correct.

14     Q    Do you have any ownership interest in any of the medical

15 facilities or medical ventures in Colorado anymore?

16     A    I don't.

17     Q    You had a business called ClinTech; is that right?

18     A    Yeah.  Oh, but let me -- I -- I -- I -- I do own some shares

19 in -- in -- in like -- like a senior nursing home type of thing in

20 Colorado.  Sorry, I forgot about that.  Never -- never -- never got paid

21 a dime out of it, so I don't really remember, but -- but I do have some

22 shares in that.

23     Q    But it's not like you were practicing orthopedic medicine,

24 correct?

25     A    Well, no, no.  I just -- I just owned as a -- you know,

ALYSSON LEDESMA, ET AL. vs ROGUE GHANTI                              JULY 30, 2024
AND TRANSAM TRUCKING, INC.
DEPOSITION OF FERNANDO TECHY, M.D.

 1   somebody came with an investment and it's -- it's -- it's related to

 2   healthcare.  So I -- I -- you asked me, so I'm telling you.

 3        Q    Were you practicing out of Colorado with ClinTech?

 4        A    ClinTech -- ClinTech used to -- yeah, my -- my clinic was

 5   called ClinTech over there.  Yep.

 6        Q    Is it still active?

 7        A    Yeah, I have a ClinTech in Texas now.  Still my -- my own

 8   personal clinic.

 9        Q    Is that here in Houston?

10        A    Yeah.

11        Q    Where's it located?

12        A    Westheimer Road.

13        Q    Now, Westheimer stretches pretty far in Houston.

14        A    Close -- close at -- at the Galleria Mall.

15        Q    Thank you.  What is America Garden Neurosciences?

16        A    That's -- that's an LLC I own that it's -- it -- actually,

17   ClinTech -- ClinTech doesn't really -- doesn't really -- there's not an

18   LLC called ClinTech.  So ClinTech does -- America Garden Neuroscience

19   does business as ClinTech.  The reason I did it because I -- I had an

20   LLC already open as -- as American Garden Neuroscience, so I just kept

21   it that way.

22        Q    Understood.  So it's your testimony that America Garden

23   Neurosciences is an LLC doing business as ClinTech?

24        A    That is correct.

25        Q    Do you live in Houston?



ALLISON DECKMAN, ET AL. VS. CHARLES CASSO
AND TRANSAM TRUCKING, INC.
DEPOSITION OF FERNANDO TECHY, M.D.

1      A      I do.

2      Q      That's your domicile state, sir?

3      A      I live in -- I mean, Woodlands, but -- but, you know.

4      Q      For the purposes of this deposition, I'll allow it.  I'll

5   allow it.  You still root for the Houston Astros, right?

6      A      Still, yes.

7      Q      There you go.  Then you're a Houstonian, brother.  Do you

8   practice here as a physician in Houston, or do you practice out in the

9   Woodlands?

10      A      No, in Houston.  My -- my office is -- is by the Galleria.

11      Q      Is part of your business, in fact, treating patients that are

12   in personal injury litigation?

13      A      That is part of my business, yes.

14      Q      In fact, most of your patients are then involved in personal

15   injury litigation, true or untrue?

16      A      I -- I -- I couldn't tell you if it's most, but I would say

17   a -- a -- there's a -- there's a large part of them.

18      Q      What all medical ventures or businesses do you have, sir?

19      A      I have -- I have a couple other LLCs and -- but they're --

20   they're -- the only one that actually goes and -- and -- and there's

21   work going is -- is I would say America Garden Neurosciences.  You may

22   find a couple other registered, but they're -- they're pretty dormant.

23   They're -- they're -- they don't do much.

24      Q      Any other cities that you see plaintiffs in litigation that

25   are your patients other than in Houston?

ALISSON LEDESMA V. TRC GLOBAL
AND TRANSAM TRUCKING, INC.
DEPOSITION OF FERNANDO TECHY, M.D.

1        A     We do -- we do have a branch of our office in Harlingen, and

2     we're considering opening -- opening a clinic in -- in -- in -- we're

3     just opening a clinic in -- in Midland, Texas.

4        Q     Do you market or advertise?

5        A     We -- we -- yeah, we have a website mostly.  We don't -- we

6     don't market much.

7        Q     Now, for Ms. Ledesma, you treated her out of Allied

8     Orthopedics and Eastside Surgery Center, true or untrue?

9        A     That's correct.

10       Q     Do you have an independent contractor agreement where you get

11    paid a certain rate depending on what procedure is performed with Allied

12    Orthopedics or Eastside Surgery Center?

13       A     With Allied Orthopedics, I get -- I -- I get paid, you know,

14    I -- I -- I have a contract.  I provide services for them, but not in

15    the -- Eastside Surgery Center is just a surgery center where we -- we

16    took the patient.  I -- I don't have a contract with them.

17       Q     So then it's a yes to my question as it relates with Allied

18    but a no as it relates to Eastside Surgery Center, true or untrue?

19       A     That's correct.

20       Q     Now, there are, for the jury's benefit, medical procedures

21    where a charge amount can be generated by something called a CPT code;

22    is that right?

23       A     What was your question again?

24       Q     There are medical procedures where a charged amount can be

25    generated by something called a CPT code, correct?



ALLISON LECKMAN, et al. vs. JOHN MANNS
AND TRANSAM TRUCKING, INC.
DEPOSITION OF FERNANDO TECHY, M.D.

1        A    That is correct.

2        Q    In fact, that is something that the AMA, the American Medical

3   Association, has generated.  They've generated a specific number via a

4   code to identify to a particular medical intervention; is that right?

5        A    I'm not sure if it -- the AMA who created it, but I'm -- I'm

6   aware that there's a CPT code.  Yes.

7        Q    And you are aware that it is regulated, maybe not aware that

8   it's regulated by the American Medical Association, but that it -- there

9   are guidelines, protocols, and -- and -- and regulations as to a specific

10  number via a code to identify a particular medical intervention, true?

11       A    Correct.

12       Q    And you have a contract to provide orthopedic services to

13  patients at Allied Orthopedics and Eastside Surgery Center, right?

14       A    I just have a contract with Allied.  I have privileges at

15  Eastside Surgery Center, but I -- I -- I don't have a contract with

16  them.

17       Q    Good deal.  I think I understand.  So you have a contract

18  with Allied Orthopedics, and whenever you need to perform a medical

19  intervention, let's say a rhizotomy or a radiofrequency ablation, you

20  will perform that procedure at the facility called Eastside Surgery

21  Center, correct?

22       A    That's correct.

23       Q    And when you say, privileges, what you mean is you're allowed

24  to use their facility in order to perform that medical intervention or

25  procedure, true or untrue?

ALISSON ZECSMAR V. TERRY MINTZ
AND TRANSAM TRUCKING, INC.
DEPOSITION OF FERNANDO TECHY, M.D.

1      A    That's right.

2      Q    And if at any point my questions are confusing, can you please

3 let me know?

4      A    I will.

5      Q    And if you don't let me know and you answer it anyway, I'm

6 going to assume that you understood my question; is that fair?

7      A    That's fair.

8      Q    And I promise you, sir, I'm not here to get you any got you

9 moments.  So -- and I'm sure your attorney will advise you if you don't

10 know the answer to my question, you can just say, I don't know.  I don't

11 want you to be guessing or nothing, okay?

12          PHILIP MORGAN:  Object -- objection.  Form.  I'm -- I'm not

13 his attorney.

14 BY ESSAY EDEN:

15      Q    So you have a contract to provide orthopedic services to

16 patients at Allied Orthopedics, correct?

17      A    I do.

18      Q    Then you are paid an amount as an independent contractor for

19 rendering medical services on their behalf, true or untrue?

20      A    That's true.

21      Q    Is the payment to you made based on what procedure is done?

22      A    It is.

23      Q    Do you have any personal knowledge what Allied charges for a

24 particular medical intervention?

25      A    I -- I -- I never really looked into their -- into their

1  bills, I'll be honest with you.

2      Q    Have you been paid for your medical treatment of Ms. Ledesma?

3      A    Yeah.  They pay me every, you know, a -- after the service is

4  provided, shortly after they pay for it.  So I -- I believe I have.

5      Q    Do you know if Allied Orthopedics or Eastside Surgery Center

6  have been paid?

7      A    I don't know if they have or not.

8      Q    So if there's any type of deferred medical care or deferred

9  medical payments through any potential agreements, you would not know

10  anything about that, true or untrue?

11      A    I wouldn't -- I would not know.

12      Q    Do you know what a charge master is, sir?

13      A    Not really.  I mean, I -- I may know, but I'm -- I'm not

14  really sure what you're -- what you're referring to.

15      Q    Good deal.  So you -- it's safe to assume then that you do

16  not maintain a charge master?

17      A    I -- I don't -- I don't know what it is.

18      Q    Now.  If I were to discuss Allied Orthopedics or Eastside

19  Surgery Center in particular with what I know they charged versus what

20  they may have told us, you're not going to give any comment on that, I

21  bet, true or untrue?

22      A    I don't -- I don't know much about it.

23      Q    Do you know how Ms. Ledesma found her way to Allied

24  Orthopedics?

25      A    I don't.



ALISSON LEDESMA VS. TRACY CHITTS
AND TRANSAM TRUCKING, INC.
DEPOSITION OF FERNANDO TECHY, M.D.

1    Q    Now, how do you allocate your time in any given day during

2    the work week?

3    A    Well, I work at my office, and I work at a couple different

4    places in -- during my week.

5    Q    Did you review the MRI imaging that her attorney reviewed

6    with us earlier in your deposition and the imaging themselves or just

7    the reports or both?

8    A    Both.

9    Q    Now, Doctor, what I'd like to do because this is a personal

10   injury kind of case is go over orthopedic medicine with you a little

11   bit. I'm ignorant about the medicine. I don't really know how it works.

12   I'm sure the jury would like to hear from your perspective, your

13   experience, and your qualification exactly what it is and how one

14   typically gets treated. So is it okay if I ask you some questions about

15   it to provide us some context?

16   A    Of course.

17   Q    Okay. Now, I'll admit it, I got a pretty bad back.  My

18   question is, if I wanted to see you or any other type of orthopedic

19   surgeon, can I just set an appointment, or do I need a referral from

20   maybe an emergency room physician or my primary care physician?

21   A    Well, it -- it depends on the insurance you have.  Some

22   insurance allow you to go see the specialist directly.  Some insurance

23   require you go see your -- your PCP first.  So that will -- that would

24   depend on that.

25   Q    Now, let's say it's the former and not the latter.  Let's say

ALLISON LECEMAR, ET AL. VS. TERRI WHITE
AND TRANSAM TRUCKING, INC.
DEPOSITION OF FERNANDO TECHY, M.D.

1    I got that health insurance that allows me to see the specialist first,

2    and I do what's called an initial consultation.  Now, that's something

3    that I could choose to do or elect to do if my health insurance allows

4    me, true or untrue?

5         A    That's true.

6         Q    If I come to you and I present with neck and back pain, can

7    you immediately tell me what my plan of care or my treatment plan is,

8    or do you need some additional information?

9         A    I -- I need some additional information.

10        Q    Now, what type of additional information would you need?

11        A    Well, I'll probably need some, you know, imaging studies to

12   see what's going on with you.

13        Q    You would need that at the initial consultation in order to

14   come up with the plan of care?

15        A    Well, it all depends.  You know, I'm -- I'm a specialist, so

16   I don't -- I don't usually see the people, you know, a day out.  I -- I

17   believe that it all depends.  This is more like an ER type of doctor,

18   maybe you're arguing that not everybody needs an MRI the first time they

19   come.

20             If -- if you believe that, you know, it may be just a sprain

21   or strain, that the symptoms are not too bad, you can kind of just give

22   it some medicine and tell them to come back in, you know, a week or two,

23   see how they're doing.  I think that's reasonable.  If you're concerned

24   that anything else could be a problem, such as, you know, herniated

25   discs, neurological compromise, pain radiating, or you're concerned

ALISSON LECSANDRO TORQUOMENTS
AND TRANSAM TRUCKING, INC.
DEPOSITION OF FERNANDO TECHY, M.D.

```
1    about anything else, instability of the neck and back, there could be a

2    fracture, then I think imaging is -- imaging is warranted to be done

3    at -- at -- at that time.  So I think it varies case by case.

4         Q    Good deal.  Good deal.  And I want to let you know, sir, I'm

5    not here to argue with you.  I'm kind of like in a fact-finding mission

6    so I could learn a little bit more.  You understand that?

7         A    I do.

8         Q    Good deal.  Now, you mentioned that sometimes you will request

9    an MRI at that initial consultation, but that you don't really handle

10   it that early in the stage.  And I'm left a little bit confused because

11   earlier in your deposition you testified with Mr. Morgan that, well,

12   you're not just the last stop, you got to handle the patient throughout

13   the life of orthopedic treatment.  Was I wrong in that understanding?

14   Was there something I may have gotten confused with?

15        A    Well, I think -- I think you're not -- and I -- I -- I did

16   say that.  What I'm telling you that I would say the vast majority of

17   times, the people get to me after they've seen their primary care doctors

18   or they've seen an ER doctor.  So rarely I -- I do order the MRI and

19   that -- that doesn't mean that I don't.  If the patient comes to me the

20   first visit and I believe he needs an MRI, I will order the MRI.  So

21   I -- I will see him the whole spectrum.  But most commonly, somebody has

22   seen a little bit before they get to me.

23        Q    Good deal.  And I don't want to misstate your testimony.  It's

24   not that your testimony is you're unqualified to have that initial

25   consultation.  It's just that more often than not, they've already had
```

1    that initial consultation, true or untrue?

2         A    That is true.

3         Q    So you are qualified to sort of give us a framework or context

4    in orthopedic medicine, especially as it occurs at the initial

5    consultation level, true or untrue?

6         A    Correct.

7         Q    Good deal.  Now, my question is:  What is it that you need to

8    see in order to, well, request for an MRI?  Because you told me earlier,

9    you're going to need more than just me saying I got neck and back pain.

10   What's a little bit of that additional information?

11        A    If -- if -- well, if -- if they have trauma, I'm -- I'm --

12   I'm more inclined to get image, if there's any significant history of

13   trauma.  If the patient -- if there's radiculopathy symptoms, they have

14   pain radiating to arms or legs.  If there's any neurological compromise,

15   you know, they have weakness, they have numbness, tingling.  Yeah,

16   those -- those would be, from a spine standpoint, I would -- I would

17   order imaging on those people.

18        Q    Good deal.  Now, I'm going to ask you a little bit about the

19   stuff that you just talked about a moment ago, okay?

20        A    Okay.

21        Q    All right.  Now, you said radiculopathy.  Now, I'm not a

22   doctor.  Could you explain what that is a little bit?

23        A    Radiculopathy is when the pain radiates to the arms or -- or

24   to the legs.  If it -- if it's -- if it's a nerve compression in your

25   neck, it will go to your arms.  That means the nerve root is irritated.

ALLISON LEUSHNER, ET AL VS. TERRY HINES
AND TRANSAM TRUCKING, INC.
DEPOSITION OF FERNANDO TECHY, M.D.

1  Or in your legs, it will go -- in -- in your back, it will go to your

2  legs.

3      Q    So it's kind of like hitting my funny bone.  I'm just feeling

4  this, like radiating sensation from the source of the pain signal all

5  the way down to the extremity?

6      A    Yeah.  Some -- some.  Like, it doesn't need to go all the way

7  down.  It can be parts of it.  But yeah, it's -- it -- it is not just

8  the pain in the neck or the back itself.  Radiates either to your

9  shoulder, to your arm or all the way to your hand or -- or all the way

10 to your foot or just -- just your buttock and -- and back of the thigh,

11 could be that.  So it's -- it's -- it -- it leaves the axial skeleton

12 and go -- it's going to the extremities.

13     Q    Now, you also said you're looking out for neurological

14 compromise.  Am I supposed to understand that as something separate and

15 apart from radiculopathy that you're also kind of looking for to know,

16 hey, this might -- this person might benefit from an MRI?

17     A    Right.

18     Q    And then you described what neurological compromise was,

19 didn't you, Doctor?  You described it as a numbness or a tingling.

20 That's the symptom that you're talking about earlier when you said that's

21 what you're looking for?

22     A    Yeah.  If -- if it's -- if it got sensory issue, it will be

23 numbness or tingling or -- or you don't feel it, or you feel hyperesthesia

24 we call it, you feel too much.  Or it can be motor.  Then you're --

25 you're having weakness of -- of various degrees to -- to that extremity.

ALISSON LUCAS MACHADO TORRES CHINELATO
AND TRANSAM TRUCKING, INC.
DEPOSITION OF FERNANDO TECHY, M.D.

1   So it can be motor or sensory, depending on the nerve that's being hurt.

2        Q    So as long as I'm having a motor deficit when I present to

3   you in our initial consultation or I'm having a sensory deprivation,

4   that provides you with suspicion that there might be a neurological

5   condition, which you're telling me is a prerequisite for you to request

6   an MRI, true or untrue?

7             PHILIP MORGAN:  Objection.  Form.  Misstates his testimony.

8   BY ESSAY EDEN:

9        Q    You can answer the question, sir.

10       A    I would -- I would say those are -- those are two symptoms,

11  yeah, I would request an MRI for.  However, they're not -- they're not

12  the -- there's other things too, that can -- I would look into to order

13  an MRI.

14       Q    What other things would you look for?

15       A    It would be pain, the -- the amount of pain, very painful.

16  If they were -- if they were involved in an accident, a trauma, there's

17  significant trauma.  If there's radiculopathy.  If there's -- yeah, so

18  I'd say history of trauma, pain, loss of sensation, loss of motor

19  strength.

20       Q    You'd agree with me that although practicing medicine is a

21  science, there's a little bit of art form -- art form to it, true,

22  Doctor?

23       A    I agree.  Yeah.

24       Q    And then what I mean by that is, well, it's you treat folks

25  by a case-by-case basis.  You don't treat them all the same.  You got



ALESSA E. LEDESMA, ET AL. VS. MARTI HANDY
AND TRANSAM TRUCKING, INC.
DEPOSITION OF FERNANDO TECHY, M.D.

1    to exercise a little bit of artistic liberty with deciding what is it

2    that you're looking for in order to determine a treatment plan, true?

3         A    That's true.

4         Q    Good deal.  Now, if I presented to you, hypothetically, I'm

5    not talking about Ms. Ledesma, and I came to you with my low back pain

6    because I got it bad, Doctor, and I told you I've got radiculopathy, I

7    was involved in a motor vehicle accident, would you feel like it would

8    be medically appropriate at that juncture to refer me for an MRI?

9              PHILIP MORGAN:  Object -- objection.  Form.  Incomplete

10   hypothetical.

11             WITNESS:  Yeah, if you're having severe back pain and --

12   and -- and you're having radiculopathy, I think it would be reasonable

13   to get an MRI for you.

14   BY ESSAY EDEN:

15        Q    Are there any risks involved with getting an MRI?

16        A    It's not much risk.  There's -- there's -- I'd say the worst

17   would be cost probably.

18        Q    Now, Doctor, what if I came to you at the initial consultation

19   with pain or symptoms of stiffness and soreness, would you still

20   recommend that MRI?

21        A    I'm sorry, say it again.

22        Q    If I came to you at that initial consultation with back pain

23   as stiffness and soreness, would you still recommend that MRI?

24             PHILIP MORGAN:  Objection.  Form.

25             WITNESS:  If -- if you were involved into -- into a motor

ALISSON LIEDTKA, ET AL. VS. TRANSAM TRANSPORT
AND TRANSAM TRUCKING, INC.
DEPOSITION OF FERNANDO TECHY, M.D.

1   vehicle accident, I probably would just from, you know, you may -- you

2   may not get anything on the MRI, but if you miss it and that person has

3   a torn ligament and, you know, or a fracture, I think it's a -- it's a

4   big problem.  So I -- I'm more inclined to order MRIs than not to order

5   MRIs.

6   BY ESSAY EDEN:

7       Q    Now, Doctor, you might not be able to tell by looking at me,

8   but I played high school football at Bel Air High School.

9       A    All right.

10      Q    There wasn't an incident where I suffered an acute injury,

11  but would your assessment change if I were not involved in a car accident,

12  but you learned that I participated in a full contact sport like

13  football?

14      A    I'm sorry, what?  Oh, like -- like if you're -- if you had a

15  football -- if you were tackled by somebody or something?

16      Q    Just a -- just a history of playing a full contact sport

17  without any acute injury or incident occurring, would you still recommend

18  the MRI?

19      A    Oh, if you were in pain and with radiculopathy and things

20  like that?

21      Q    Yes.  Yes, Doctor.

22      A    Oh, I would for sure.

23           ESSAY EDEN:  Can we go off the record really quickly?

24           PHILIP MORGAN:  Sure.

25           NOTARY:  The time is 6:44 p.m.  We are off the record.

ALISSON LEDESMA, TEXAS CENTRAL
AND TRANSAM TRUCKING, INC.
DEPOSITION OF FERNANDO TECHY, M.D.

```
1              (OFF THE RECORD)

2              NOTARY:  The time is 6:57 p.m.  We're on the record.

3    BY ESSAY EDEN:

4        Q     Good deal.  Doctor, we're back on the record.  Thank you for

5    allowing me to have that five minutes to deal with the fire alarm that's

6    being tested right now.

7              Do you still have some energy to keep going, Doctor?

8        A     Got energy to go.  Let's go.

9        Q     Good deal.  Good deal.  Now, Doctor, I read your CV and you

10   wrote some papers on biokinematics and some effects post-surgery that

11   touch on kinematics and body movement; is that right?

12       A     Which -- which article are your -- biokinematics of post-

13   surgery?  I'm not -- I'm not sure which -- to which one you're --

14   you're -- you're alluding to.

15       Q     Well, I'm just alluding to your CV that mentions it.  Are

16   you -- so are you giving any opinions on this case about biokinematics?

17       A     I mean, I -- I have an understanding of biokinematics, but by

18   no means I am a, you know, accident guy to see how much the acceleration

19   was, the brakes, or any of that.  So I'm not in -- if that -- in that

20   regard, I will not comment anything.

21       Q     And when you say you won't comment on anything, what you mean

22   is you won't prepare or render an opinion on it as it relates to Ms.

23   Ledesma's lawsuit, true or untrue?

24       A     Correct.

25       Q     Now, I want to go over some of the treatment you provided for
```

ALISSON LECESNAY vs. TRUGREENT34
AND TRANSAM TRUCKING, INC.
DEPOSITION OF FERNANDO TECHY, M.D.

 1   her, but not about her.  Do -- do you understand what I'm saying?

 2        A    Not exactly.

 3        Q    What I want to do is I want to talk to you about the injections

 4   you provided her.  I want to talk about the differences between those

 5   injections  and  when  they  might  be  medically  appropriate  or  not

 6   appropriate to be provided.  Now do you understand, Doctor?

 7        A    I do.

 8        Q    Good deal.  Good deal.  Now, what is it that you're looking

 9   for once you get an MRI to determine whether or not a patient would

10   benefit from an epidural steroid injection?

11        A    Well,  the  MRI  --  the  MRI  will  show  you  the  status  of

12   everything, you know?  Will show you how the bone is, if -- if there's

13   a fracture, if there's a disc, if there's herniation, is there -- is

14   there nerve impingement?  So gives you -- gives you many -- a lot of

15   information of -- of what, you know, how you can help them.

16        Q    And you would call that an objective impression, correct?

17        A    That is -- the MRI is -- is objective, correct.

18        Q    Would you still need a clinical impression from the patient

19   in order to determine whether or not the treatment would be appropriate

20   or necessary?

21        A    I -- I would, yes.

22        Q    And when we say clinical impressions, are we talking about

23   the pain that they're suffering from and how they describe that pain?

24        A    Correct.  It's -- it's the history that they tell you

25   what's -- what's wrong with them and then the physical exam.  Those



ALFSSON-BRELSHAW V. TRECK-HINTS
AND TRANSAM TRUCKING, INC.
DEPOSITION OF FERNANDO TECHY, M.D.

1    are -- those are the -- the clinical visit, the -- those two things.

2         Q    Because if I tell you, Doctor, I got a pain in my lower back,

3    you would want me to describe that pain as either a soreness, a stiffness,

4    a sharp pain, a shooting pain, a burning pain, or anything like that,

5    true or untrue?

6         A    It -- it -- it -- that is -- that is classical medicine.

7    We -- throughout the years, what I've noticed is that people describe

8    things differently from spasm to pain to burning to stabbing.  In the

9    end -- in the end of the day, doesn't -- doesn't really help me too

10   much.  The characteristic for -- for back pain from a herniated disc,

11   it can be a -- a combination of all that, just one of them.  That doesn't

12   really point me one way or another the way they describe it.

13        Q    And there are times where a patient may have objective

14   impressions, meaning something positive on their MRIs, but no clinical

15   impressions, meaning no symptoms being generated by those objective

16   impressions, true or untrue?

17        A    That is true.

18        Q    In other words, someone can have disc herniations, but maybe

19   those disc herniations don't generate any pain signals, true or untrue?

20        A    That's true.

21        Q    So just because someone has objective impressions and you see

22   them on the MRI report, but then they don't have a clinical impression,

23   meaning they're not suffering from any pain symptoms or no pain is being

24   generated, would you then recommend an epidural steroid injection?

25        A    I would not.

ALLISON LEUENHAGEN, ET AL. VS. JOHN IGHTS
AND TRANSAM TRUCKING, INC.
DEPOSITION OF FERNANDO TECHY, M.D.

1      Q      What's the ultimate goal behind receiving an epidural steroid

2  injection?

3      A      To get better from your symptoms.

4      Q      You typically schedule or calendar a postoperative

5  appointment with the patient after they received an epidural steroid

6  injection, yes or no?

7      A      Usually, yeah.

8      Q      And what are you looking for in that postoperative

9  appointment?

10     A      To -- to see the result, how they're doing.  You know, are

11  they happy enough with it, or do they need more things done?

12     Q      And when you say, to see the result, what do you mean?  Do

13  you mean how the pain has been alleviated or for how long the injection

14  was effective for?

15     A      Well, both.  If the pain's still not back, then that's the

16  best scenario you -- you -- you want.  But if -- if the pain has returned,

17  yeah, it's how long it lasted.  It's a -- it's an important part of

18  the -- the -- the question.

19     Q      What happens if the pain returns, but then the pain returns

20  after an expiration of two to three weeks?

21     A      Well, then -- then you need to do -- then you got to ask the

22  patient, you know, how is your pain?  Are -- are you happy the way you

23  are?  Or if they're not happy the way they are, they want to -- they

24  want to improve that pain, then -- then you need to do more things.  And

25  you go into other types of injections or, you know, you -- you analyze

ALISSON LECLAIR, TARGUMENTE
AND TRANSAM TRUCKING, INC.
DEPOSITION OF FERNANDO TECHY, M.D.

1    what -- what's best at that point.

2            But if -- if -- if it lasted three days or it lasted three

3    weeks and you saw them at a month after, you just kind of get an idea

4    that if it lasted three days, it's probably going to be a more difficult

5    process to control.  But it doesn't really change much what you're --

6    what you're doing.  You just go to the next step.

7        Q    Now, what do you mean by, more things?  Let's say they come

8    back after two to three weeks with -- well, the pain comes back after

9    two to three weeks.  Are you saying more things as in escalate the level

10   of treatment, or do you mean repeat the same treatment?

11       A    You -- you can either way.  I think it's -- you can try --

12   you can try the same injection.  You can -- you -- I -- I normally do

13   something different, but I know doctors who will -- who will repeat

14   the -- the same -- the same process of -- I know a -- a -- several

15   doctors that will do, you know, one, two, three epidural injections.

16   And I think that's fairly common practice.  I like to do different --

17   different approaches.  Just personal preference.

18       Q    When would you recommend a medial branch block versus an

19   epidural steroid injection?

20       A    So medial -- medial branch, I -- I'm -- I'm a big fan of

21   medial branch blocks.  I -- I really like them.  I think they -- they

22   do treat the axial pain and the -- and the radiculopathy.

23           In -- in theory, the epidural injection is more designed for

24   the -- for the radiculopathy pain.  So if they come with a stray

25   radiculopathy, very minimal back pain, it's more the leg that's hurting,

ALLSOP, LEE SWAIN, TEXAS GIANTS
AND TRANSAM TRUCKING, INC.
DEPOSITION OF FERNANDO TECHY, M.D.

1  then you do an epidural.  If they come with more back pain than leg

2  pain, then you do a medial branch block.  But these things are

3  interchangeable.

4          The -- the epidural will treat the back pain.  The medial

5  branch block will treat the leg pain.  So it -- it comes down to doctor

6  preference.  Some doctors will start with the epidural.  Some will start

7  with the MBB.  But in -- in general, if you go read a book, the epidural

8  is more designed for radiculopathy.  The -- the MBB is more designed for

9  the axial pain.

10         Q     Good deal.  I understand what you're telling me.  Now, I know

11  a little bit about it myself, but talking about it, I'm going to expose

12  how ignorant I may be.  From my understanding, a medial branch block is

13  both -- well, a therapeutic procedure and a diagnostic procedure all

14  wrapped up in one.  Is that true or untrue?

15         A     Yeah, it's true.

16         Q     And when I say, therapeutic procedure, what I mean is, well,

17  it's utilized to help manage the pain, manage and alleviate the symptoms,

18  but there's also a second utility for a medial branch block in which

19  it's used as a diagnostic tool to learn about if that may be the

20  appropriate facet level to perform a more interventional surgery, true

21  or untrue?

22         A     That's true.

23         Q     Does the epidural steroid injection have the same utility?

24  Are you using it as both a therapeutic tool as well as a diagnostic

25  tool, or is it exclusively one versus the other?



ALLISON LECKMAN, ET AL. V. OSCAR GUERRA-MENDEZ
AND TRANSAM TRUCKING, INC.
DEPOSITION OF FERNANDO TECHY, M.D.

1       A    It -- it depends on how you do the epidural.  If you put the

2  epidural in the midline and you just -- you just flush medicine through

3  the whole spine, then it's -- it's just therapeutic because you're --

4  you're flushing every level.  If you are -- if -- and if you do a --

5  what they call a selective nerve root block or a transforaminal lumbar

6  epidural, where you put the epidural through -- through its separate

7  nerves, then it can -- it can be both.  It can be diagnostic and

8  therapeutic.

9       Q    I understand.  It depends on the specific site in which you

10 perform the epidural steroid injection in order for it to be both

11 therapeutic and diagnostic, true or untrue?

12      A    That's true.

13      Q    Good deal.  What about what it is you're looking for in that

14 post-procedure appointment with the patient after a medial branch block?

15 Are you looking for a lot of the same things that you do when you're

16 seeing your patient after an epidural steroid injection?

17      A    Well, the medial branch block, as you said, there's -- there's

18 the bigger characteristic of the -- of the -- the diagnostic, too.  If

19 you do the medial branch block, and they did -- they did very well, and

20 the pain is returning, you know -- you know, even though the pain is

21 returning, you know you're at the right place.

22           So -- so that tells you that you're -- you're good to go do

23 the rhizotomy, which is the -- the -- the ablation of the nerves that --

24 that you've numbed with the medicine.  Now you can go in a -- in a more,

25 let's put it, in a more permanent solution, which is the rhizotomy.  So

ALISSON LECESNE vs. TRCGJ MGMT.
AND TRANSAM TRUCKING, INC.
DEPOSITION OF FERNANDO TECHY, M.D.

1   that's sort of the basic what you're looking at.

2        Q    Now, if a patient comes back to you and says, Doctor, that

3   medial branch block felt amazing, it alleviated my pain 100 percent, but

4   then, well, the pain came back after two to three weeks, and it came

5   back at 75 percent at the pre-injection levels, what would you do then?

6   Would you recommend a second medial branch block?  Would you escalate

7   the treatment because it's a diagnostic procedure for something more

8   interventional, or would you say, let's bide our time?

9             PHILIP MORGAN:  Form.

10            WITNESS:  So -- so there's a little confusion on these things

11  here.  There's -- I'll give you an example.  Like -- like Blue Cross,

12  Aetna, Medicare, they -- they will require that you do two medial branch

13  blocks before you go to a rhizotomy.  So those are -- those are -- those

14  are the times that I will do just because it -- the insurance requires

15  you to do it.  And they're based then in -- in -- in -- in some --

16  some -- some articles.

17            There are, however, some other articles that will say one is

18  enough.  So if you do one time and you know that that's the level,

19  then -- then you can proceed with the rhizotomy.  So I believe it's both

20  are correct to do.  Some doctors will be more conservative, or they are

21  guided by insurance guidelines that they have to go that way.  Then you

22  do two medial branch blocks and then the rhizotomy as opposed to, I would

23  say, vast majority of doctors, they will do one and then they will go

24  to the rhizotomy if the insurance will allow them to do it.

25  BY ESSAY EDEN:



ALLISON LECKMAN, ET AL. V. PGR TRUCKING
AND TRANSAM TRUCKING, INC.
DEPOSITION OF FERNANDO TECHY, M.D.

1    Q    Understood.  So it's your testimony that it would be medically

2    appropriate to just do one before -- one medial branch block before

3    escalating to a rhizotomy?

4    A    I -- I believe it is.

5    Q    Is there a percentage that the pain needs to come back in

6    order for you to elect to do the rhizotomy?  Let's say it comes back at

7    50 percent pre-injection levels v. 80 percent, would you still elect for

8    the rhizotomy even if the pain came back at only 50 percent?

9    A    Well, I -- I believe Medicare has a guideline that is a

10   reduction in pain in 80 percent and reduction in -- or improvement of

11   function in 50 percent.  Those are just numbers that they want you to --

12   to -- to -- to -- to look kind of to guide.

13          I believe, if, you know, if they had -- they had maybe a

14   slightly less, I think it's fine.  I like when they say that they improve

15   more than -- more than, you know, what -- what the guidelines of the

16   insurance say because then, you know, nobody's going to question.  But

17   I've -- I'm not opposed 100 percent to -- because otherwise, what's the

18   option?  The option is to leave them in pain.  What are you going to do?

19   Go and put eight screws in their back now because the -- because the MBB

20   was 49 percent better v. 50?  I -- I think there's a little give on

21   that -- on the -- on that -- on that rule.

22          You give the option to the patient.  You tell them -- I always

23   tell them, listen, guidelines say if -- if it didn't get -- didn't get

24   better 50 percent, likely the -- the -- the rhizotomy is not going to

25   help you for a long time.

**Skribe**

ALISSON LUCAS MAIS, TRCG UNITS
AND TRANSAM TRUCKING, INC.
DEPOSITION OF FERNANDO TECHY, M.D.

1      Q      Got you.

2      A      And yeah, but -- but I would say most -- most people that we

3  do rhizotomies, they -- they're -- they improve almost 100 percent

4  because you -- you block a lot.  You -- you anesthetize the whole joint.

5  So there's no way these guys are feeling pain because it's all numb.

6  It's like when you go to the dentist, you don't feel your mouth for half

7  a day.  So kind of there -- there's no real pain going on and the pain

8  actually come back.  So I would say it's not -- it's not an issue we run

9  into too frequently.

10     Q      I understand, Doctor.   Now, you refer to the Medicare

11  guidelines pretty frequently in your -- in your deposition today.  Is

12  that something you refer to or -- or practice consistently with?

13     A      Medicare is just -- is just a bigger government payment.

14  Every -- every insurance goes -- every insurance goes on the, you know,

15  they -- they make the rules based on Medicare.  And it -- it -- it is

16  just -- it's just a guideline.  Doesn't -- doesn't mean you have to go

17  by it.  But it's -- it's -- it's something that -- it -- it's a guideline,

18  you know?  Help -- helps you -- helps you just -- I -- I -- I personally,

19  I -- do I like Medicare guidelines?  Not really because they're just

20  very -- you know, designed to not to approve too much stuff for obvious

21  reasons.  But those are the guidelines we have.  So if we see Medicare,

22  you know, we have to go by them.

23     Q      And I really liked the way you summarized your answer there.

24  You -- you practice in a way in which is medically appropriate, true or

25  untrue?

1        A    I -- I believe.  I like to believe so.

2        Q    And you like to believe that you're practicing medically

3    appropriately by whose guidelines exactly?  Do you practice consistent

4    with sort of the governing body that is the American Medical Association

5    or other folks that you kind of look to their standards for what you

6    believe would be medically appropriate or not appropriate for the types

7    of treatment you would provide folks?

8        A    I think -- I think I -- I practice based on -- on a combination

9    of things, probably.  I practice based on, you know, my character, if --

10   I'm 46 years old, the way I was brought up as -- as -- as -- as a child,

11   the, you know, what things I learned in college, what I learned in

12   medical school, fellowship.  Of course, the societies I -- I belong to,

13   you know, I think you put all together and you -- I try to get what I

14   think it makes sense from -- from all of it and create my own way of

15   doing what I believe is best for the patient.

16            I think every -- every society, every -- every institution

17   will have their -- their good and bad things.  Most of the things align

18   and -- and, you know, it's not -- it's not, you know, what one -- one

19   body says is -- is fairly -- there's some -- some variations.  Like, for

20   example, the -- the -- the one medial branch block, I -- I think is

21   enough.  I think it's -- I think it's unreasonable to bring a guy that

22   lives 400 miles away for a second shot of lidocaine that's going to last

23   him 12 hours just to take another -- I just think it's not going to

24   happen.

25       Q    Yeah.  So I'm inclined to agree with you in that hypothetical,



ALLISON ZIEGLER V. TERRY MANIS
AND TRANSAM TRUCKING, INC.
DEPOSITION OF FERNANDO TECHY, M.D.

1   Doctor.

2        A    I try to -- try to adapt to -- to life, you know?  Guidelines

3   are beautiful on paper by people in -- in Washington who write them,

4   but -- but that -- they -- they're not there in the ER seeing the guy

5   bleeding in front of you.  So sometimes you got to go, you know, to

6   change a little bit. But with -- within reason, within, you know, within

7   what -- what's acceptable.  That -- that's how I think it is, what --

8   what I believe.

9        Q    Do you deviate sometimes from the American Medical

10  Association, Doctor?

11       A    I don't -- I don't even know their guidelines.  I'm -- I'm a

12  surgeon.  I -- I don't think I ever read their guidelines, so I couldn't

13  tell you.  But I -- but I believe my orthopedic board guidelines, my

14  surgery guidelines are -- are -- are based somewhat in line with those

15  American Medical Association.  But I'll be honest with you, I -- I don't

16  think I've ever read it.

17       Q    You understand that the American Medical Association is a

18  peer-reviewed organization in the United States, don't you, Doctor?

19       A    I do.

20       Q    Are you a member?

21       A    I'm not.

22       Q    But you have stayed abreast of conventional wisdom and thought

23  in your industry when it comes to medical ethics, have you not?

24       A    I'm sorry, say it again.

25       Q    You've stayed abreast of conventional wisdom and thought in



ALLISON LECESNAY, INDIVIDUALLY, TERRY MINTS
AND TRANSAM TRUCKING, INC.
DEPOSITION OF FERNANDO TECHY, M.D.

 1  │ your industry when it comes to medical ethics, have you not?

 2  │     A    Yeah, of course.

 3  │     Q    You understand that the American Medical Association cautions

 4  │ against treaters like yourself from making causation opinions for their

 5  │ patients when they are in litigation, don't you?

 6  │     A    I'm not aware of it.

 7  │     Q    Do you believe that quote, "Treating clinicians raise

 8  │ considerable financial and social conflicts of interest if they attempt

 9  │ to engage in any forensic activity, such as causation analysis in regards

10  │ to their patients"?

11  │     A    I'm -- I'm not aware of it, nor I agree with it.

12  │     Q    And reading from the AMA, which I'll represent to you is the

13  │ American Medical Association causation text, and I quote, "It is a

14  │ fallacy to conclude that one event followed by a second necessarily

15  │ demonstrates a causal relationship between the events."

16  │          Do you believe that it is a fallacy to conclude that the

17  │ timing of complaints that occur after an accident should be used to serve

18  │ as a causation analysis by a treating physician?

19  │          PHILIP MORGAN:  Objection.  Form.

20  │          WITNESS:  I don't agree with that.

21  │ BY ESSAY EDEN:

22  │     Q    If the American Medical Association says it's not a credible

23  │ basis to make a causation determination based on the timing of an

24  │ accident and the timing of complaints, would you agree or disagree with

25  │ that?



ALYSSON LEDESMA v. TRENT GHENT AND TRANSAM TRUCKING, INC.
DEPOSITION OF FERNANDO TECHY, M.D.

1        A     I completely disagree.

2        Q     Now, you've given affidavit testimony in Wyoming and other

3   states where you have been called upon to give expert testimony, have

4   you not?

5        A     I might have.  I don't recall.

6        Q     In reading from an affidavit you gave in District Court in

7   Wyoming in a case called Mark Salazar v. State Farm, you said, quote,

8   "As a treating physician, I do not describe the incident or traumatic

9   incident causing the symptoms.  That is the job of the patient's attorney

10  or whomever is doing that part of the trial.  As a treating physician,

11  I only describe his injury."

12             Do you recall that?

13       A     I don't recall, but I -- but I don't disagree with it if I

14  said so.  I think it's a -- it's a valid statement.

15       Q     The entirety of any causation opinions in this case that you

16  give are based on the patient history given to you by Ms. Ledesma, true

17  or untrue?

18       A     That is true.

19             PHILIP MORGAN:  Objection.

20  BY ESSAY EDEN:

21       Q     In other words, you have not looked at any pictures, conducted

22  any investigations, looked at the severity or positioning in the vehicle

23  or anything about her body or how it reacted, other than what she told

24  you in the patient history when she presented to you for care, true or

25  untrue?



ALISSON LECLsMA... T..CHY GHANTS
AND TRANSAM TRUCKING, INC.
DEPOSITION OF FERNANDO TECHY, M.D.

1      A    That's true.

2      Q    Are you familiar with the American Medical Association's

3  causation protocol?

4      A    I'm not familiar with it.

5      Q    Kind of discusses exactly what I was quoting earlier during

6  your deposition.  And my question is, have you ever taken a course or

7  actually read the AMA guidelines on causation protocols?

8      A    No, I have not.

9      Q    And in this case, you didn't employ the American Medical

10  Association guidelines, but instead your own causation protocol that you

11  claim you learned in your residency, true or untrue?

12      A    Yeah, my residency, my fellowship, my two residencies, my --

13  you know, several places I've worked at, colleagues I've seen.  Yeah.

14      Q    Do you know if that protocol has been approved by a court?

15      A    I -- I -- I don't know much about -- I -- I -- I don't even

16  know that protocol exists.  I don't know much about it.

17      Q    I meant more so your methodology or theory in which you

18  determine causation.  Has that methodology that you utilize in order to

19  determine whether or not something was within reasonable medical

20  probability caused by something else, has that been submitted and

21  approved by a court?

22      A    I don't know.  I don't know.  I'm not -- I -- I don't know.

23      Q    And to reiterate, you're not giving a biokinematics opinion

24  on this case.  In other words, you're not evaluating how a body moves,

25  measuring the forces that act on human joints, bones, muscles, ligaments,

ALASSON LECLSNAL V. TRANSPORTS
AND TRANSAM TRUCKING, INC.
DEPOSITION OF FERNANDO TECHY, M.D.

1 and the -- and then predict certain outcomes, whether it's injury causing

2 or not?  That -- that's a discipline that you're not exercising, true

3 or untrue?

4      A    That's true.

5      Q    Now, the methodology in which you determine causation and

6 whether something within reasonable medical probability was caused by

7 an incident such as a car accident, do you know if your theory or

8 methodology or protocol that you apply to determine causation, do you

9 know if it's ever been tested?

10          PHILIP MORGAN:  Form.

11          WITNESS:  Well, it's been tested.  It's -- it's -- it's how

12 every spine surgeon I know practices medicine.  You know, probably know

13 over a hundred surgeons from, you know, from Harvard, Stanford, Cleveland

14 Clinic, Mayo, University of Illinois, University of Chicago, and where

15 I train, the -- the people, I -- I -- I -- I do the boards with, in the

16 military where I'm a -- I'm a spine surgeon for the military.

17          So it -- it's -- it's -- it's -- I don't -- I don't -- there's

18 no real that I use -- I'm not saying that there's no, you know, of course

19 there are protocols.  I -- I bet you they are.  But I think how -- how

20 we do it is by personal experience and then just guided by -- by -- by

21 hundreds of surgeons I know that have taught me how to do this.

22      ESSAY EDEN:    Objection as to the nonresponsive portion of the

23 answer.

24 BY ESSAY EDEN:

25      Q    Now, Doctor, I trust that you're qualified and not really

ALLISON LEDESMA, ET AL. V. TRANSAM TRANSIT
AND TRANSAM TRUCKING, INC.
DEPOSITION OF FERNANDO TECHY, M.D.

1    trying to talk about your qualifications or your experience, but more

2    so the methodology that you use or exercise in the determining your

3    causation, conclusions, or opinions.  Now, my question is:  Do you know

4    if your methodology, your theory, your protocol in determining causation,

5    if it's ever been subjected to peer-review or publication?

6        A    I -- I'm not aware of any publication of -- of -- of how do

7    you -- like how do -- how you do a clinical visit on a patient.  I --

8    I'm just not aware.  What I'm telling you is that, you know, that's how

9    I've watched and how I learned throughout, you know, years of -- of, you

10   know, several years in -- in school and -- and observing doctors and see

11   how they work.  It -- it's more an observation in learning in -- in --

12   in -- in -- in a way, but I'm not aware of any studies that published

13   that way on how to proceed.

14            ESSAY EDEN:  Objection to the nonresponsive portion of the

15   answer.

16   BY ESSAY EDEN:

17       Q    What about your rate of error, Doctor, the -- the protocol

18   theory or methodology in which you exercise in order to determine

19   causation within a reasonable medical probability, do you know the rate

20   of error?

21       A    I couldn't tell you a rate of error.  I don't know.

22       Q    Have you ever submitted your theory or methodology or protocol

23   in determining causation within a reasonable medical probability to any

24   relevant scientific community and have them say, look, we looked at Dr.

25   Techy's methods and protocols in determining causation within a



ALISSON LECLsMAYR, TRUCKGHTS
AND TRANSAM TRUCKING, INC.
DEPOSITION OF FERNANDO TECHY, M.D.

```
 1  reasonable medical probability and we liked it; has that ever happened?

 2            PHILIP MORGAN:  Form.

 3            WITNESS:  No.

 4  BY ESSAY EDEN:

 5       Q    And you are not relying on objective impressions to determine

 6  causation, are you, Doctor?  You are using subjective interpretation,

 7  true or untrue?

 8            PHILIP MORGAN:  Form.

 9            WITNESS:  Well, how -- how I make the diagnosis is based on

10  three things.  One is the -- the clinical history the patient tells,

11  the -- the exam, and the imaging.  So two of these things are objective,

12  which is the exam and the imaging, and one is subjective, which is the

13  history.  So I would say is a combination of objective and subjective

14  data that you put together to make a diagnosis.

15            ESSAY EDEN:  Objection as nonresponsive.

16  BY ESSAY EDEN:

17       Q    Doctor, I think I may have failed in asking my question and

18  I apologize.  I was not asking about the impressions you rely on to make

19  a diagnosis, Doctor.  I was asking about the impressions or factors that

20  you rely on to make your opinion regarding causation in which you say,

21  within reasonable medical probability this accident caused her injuries.

22  Do you understand the distinction that I'm making, Doctor?

23       A    I do, yes.

24       Q    Good deal.  So you understand that I'm not talking about your

25  diagnosis in which you rely on the objective impressions and clinical
```

ALISSON LEDESMA VS. TRUCK MOVERS
AND TRANSAM TRUCKING, INC.
DEPOSITION OF FERNANDO TECHY, M.D.

1   impressions that we discussed earlier, but I'm more so talking about

2   your opinion as a qualified expert that is non-retained in this lawsuit,

3   about whether or not this car accident that we are here for today caused

4   Ms. Ledesma's injuries.  Do you understand that?

5       A    I understand.

6       Q    Now, my question is:  You're not relying on any objective

7   impressions to render your opinion on causation.  You're using subjective

8   interpretation, true or untrue?

9            PHILIP MORGAN:  Object.  Form.

10  BY ESSAY EDEN:

11      Q    You can answer, Doctor.  True or untrue?

12      A    True.

13      Q    Doctor, have you understood all my questions today?

14      A    I have.

15      Q    Have I been kind and respectful to you, Dr. Techy?

16      A    You've been very nice.

17           ESSAY EDEN:  You've been very nice yourself, sir.  Thank you

18  so very much.  I'll pass the witness.

19           WITNESS:  Wonderful.

20                              EXAMINATION

21  BY PHILIP MORGAN:

22      Q    All right.  I do have some follow-up questions, Dr. Techy.

23  You considered the fact that Ms. Ledesma was in a car crash on April 7,

24  2022, correct?

25      A    Correct.



ALISSON LEDESMA,  TEACH (TRAN)
AND TRANSAM TRUCKING, INC.
DEPOSITION OF FERNANDO TECHY, M.D.

1    Q    And  immediately  thereafter,  she  started  experiencing

2  symptoms, correct?

3    A    Correct.

4    Q    And then eventually there was imaging done in an -- an MRI

5  showing herniated discs, correct?

6    A    That's correct.

7    Q    Based on your education and -- and experience, tying those

8  three things together, is it -- is that the standard -- is that a standard

9  way of determining that the crash caused the injuries that she was --

10  that she is suffering?

11         ESSAY EDEN:  Objection.  Asked and answered.

12         WITNESS:  That -- that is the standard, yes.

13  BY PHILIP MORGAN:

14    Q    Okay.  And -- and you learned that standard through your

15  education and experience?

16    A    Correct.

17    Q    And is it your understanding that that standard is followed

18  by hundreds, if not thousands of treating physicians?

19    A    I -- I -- yeah, I could say that -- that I know personally

20  hundreds at least for sure, but -- but very likely thousands throughout

21  the world.

22    Q    Okay.  Is there anything else that you've seen that could --

23  you could point to, to say this is the source or cause of Ms. Ledesma's

24  injuries?

25    A    No, I think we -- we made it clear what I think it is.  There's

ALISSON LEDESMA V. TRANSAMERICA                                   JULY 09, 2024
AND TRANSAM TRUCKING, INC.
DEPOSITION OF FERNANDO TECHY, M.D.

1    nothing else that I think.

2         Q    Can a car crash cause herniated discs?

3         A    Yes.

4         Q    Okay.  If Ms. Ledesma had herniated discs prior to this crash,

5    is it your understanding that those herniated discs weren't causing any

6    pain or symptoms?

7         A    Yeah, true.

8         Q    Would the new pain that Ms. Ledesma is reporting immediately

9    after the crash, would that be considered an injury to her back?

10        A    Yes.

11        Q    So in other words, if Defendant's paid testifier were to state

12   that the herniations that we saw in Ms. Ledesma's MRIs were degenerative,

13   even though she was 20 years old, as far as we know, those issues were

14   not causing any pain prior to the crash, correct?

15        A    Correct.

16        Q    And so, if those herniations were there, as Defendant's paid

17   testifiers states, there was a new injury to Ms. Ledesma because of the

18   crash because she started experiencing new pain; is that correct?

19        A    That's correct.

20        Q    And that -- that injury that we're talking about, that new --

21   that new pain, that would've been caused by the crash, correct?

22        A    Correct.

23        Q    And -- and your -- your opinion is within a reasonable degree

24   of medical probability that her -- her injuries, the -- the -- the --

25   were caused by the crash, correct?

ALLISON LEDESMA vs. TERRY HANKS
AND TRANSAM TRUCKING, INC.
DEPOSITION OF FERNANDO TECHY, M.D.

1      A    Correct.

2      Q    So even -- even if Defendant's paid testifier is to be

3   believed that Ms. -- that at 20 years old, Ms. Ledesma had degenerative

4   changes in her spine, because those changes were not causing her any

5   pain prior to the crash, is it your opinion within a reasonable degree

6   of medical probability that Ms. Ledesma still suffered an injury because

7   of the crash, because of the new pain she's reporting?

8      A    Yes.

9      Q    There was a line of question -- questioning about MRIs that

10  I -- I candidly didn't -- didn't understand or follow.  However, it --

11  let's do this.  Doctor, I'm going to share my -- share my screen.  All

12  right.  We're looking back at the -- the treatment summary that we looked

13  at before.  We see that the crash occurred on -- on April 7th, correct?

14     A    Yes.

15     Q    And Ms. Ledesma was reporting pain to her treating physician

16  after the crash.  In fact, she saw a doctor two days later, reporting

17  pain, correct?

18     A    Correct.

19     Q    And she started on a -- a series of -- of chiropractic or

20  physical therapy sessions, completed 45 sessions over the course of

21  several months, correct?

22     A    Right.

23     Q    Correct?

24     A    Correct, I see it.  Yeah.

25     Q    Oh, sorry.  And then about a month after the crash, MRI

ALLISON LEDESMA VS. TROY GENTRY
AND TRANSAM TRUCKING, INC.
DEPOSITION OF FERNANDO TECHY, M.D.

1  imaging is ordered because Ms. Ledesma is still experiencing pain.  Is

2  it your opinion as a practicing surgeon and who -- who treats patients

3  involved in traumatic events such as a car crash that these MRIs were

4  reasonably medically necessary?

5      A    Oh, for sure.

6      PHILIP MORGAN:  I have -- I have no further questions.  I'll

7  pass the witness.

8                          EXAMINATION

9  BY ESSAY EDEN:

10     Q    Hey, Doctor, I got a few more for you.  I know I said it was

11 only going to be 30 minutes and I under promise, over deliver, but

12 sometimes we're wrong.  Is that okay if I ask you some more questions?

13     A    Sure.

14     Q    Good deal.  Now, at that slide that Mr. Morgan presented

15 earlier, on that timeline it shows that there were MRIs performed on May

16 11th of 2022; is that true?  Were the MRIs performed on May 11th of

17 2022?

18     A    I'm not sure.  We -- we need to go see the report, when the

19 date says.  That I couldn't tell right now.

20     ESSAY EDEN:  Mr. Morgan, is it okay if you go ahead and post

21 that timeline right back up, sir?

22     I'm sorry, is my -- is my audio not working?  I'm sorry.

23     PHILIP MORGAN:  No, no --

24     ESSAY EDEN:  Mr. Morgan, is it okay if you could put it right

25 back up, sir?

ALISSON LEDESMA, ET AL. VS. HEINZ HINTZE
AND TRANSAM TRUCKING, INC.
DEPOSITION OF FERNANDO TECHY, M.D.

1          PHILIP MORGAN:  Sure.

2          ESSAY EDEN:  Thank you.

3   BY ESSAY EDEN:

4      Q     All right.  Do you see this little timeline on your screen,

5   sir?

6      A     Yeah.

7      Q     Okay.  And then on that 1, 2, 3, 4, fourth asterisk there, or

8   bullet point rather, it says, 5-11-22 MRI imaging.  Do you understand

9   that to mean that she received MRI imaging on May 11th of 2022?

10     A     That is what I understand.

11     Q     Now, it doesn't look like she got any other MRI images done

12  on this timeline, so when we're talking about the objective impressions

13  that you rely on in determining what medical treatment would be medically

14  appropriate or inappropriate for Ms. Ledesma, is it safe to presume that

15  the objective impressions you were relying on were from those May 11th,

16  2022, MRI images?

17          PHILIP MORGAN:  Objection.  Form.  Misstates his prior

18  testimony.  There are two sets of MRIs.  They are just not reflected on

19  the outline.

20          WITNESS:  Yeah, I think right after Dr. Lee sees her in August

21  and September, he orders a new one.  So when I -- when I see her in --

22  in September, she just had done an MRI.  I think it was fairly -- fairly

23  recent.

24  BY ESSAY EDEN:

25     Q     Now, I want to talk to you a little bit about the treatment

ALISSON LEDESMA VS. TRANSAM TRUCKING
AND TRANSAM TRUCKING, INC.
DEPOSITION OF FERNANDO TECHY, M.D.

```
 1    you provided for Ms. Ledesma now.  In other words, I don't want to talk

 2    about it in a general sense as it relates to orthopedic medicine, but

 3    more so the treatment you provided for her; do you understand?

 4         A    Yes.

 5         Q    Okay.  Now, what was it that you were looking for as it

 6    relates to the MRI of her cervical spine for you to believe that it

 7    would be medically appropriate for her to receive the treatment she

 8    received afterwards?

 9         A    So again, it's a combination of -- of the exam that I do,

10    the -- the history, and the MRI.  So as she comes to me, she -- she's --

11    she told the whole story that we heard several times today, and she is

12    still in pain.  When I look, she -- as I examine her, her pain is in the

13    neck is from C4 to C7, and in -- in the lumbar spine, L3 to S1.

14              I think, as we look at the MRIs of the -- we look at the MRI,

15    she has herniated disc at C4-5 and C5-6, and L4-5 in the lumbar spine.

16    So it -- to me, it matches.  You know, she has a couple herniated discs

17    in the neck, one in the -- one in the low back, with facet pain, three

18    levels in the neck, three levels in the back.  So I thought it was --

19    it would be appropriate to do a -- a -- a three-level medial branch

20    block in each, in the neck and back.

21         Q    Good deal.  So you're relying on the May 11th, 2022, MRIs for

22    the objective impressions as it relates to your treatment care plan for

23    Ms. Ledesma?

24              PHILIP MORGAN:  Objection.

25              WITNESS:  I was -- I was -- on the MRI of September of --
```

ALISSON LEDESMA VS. TRANSAM TRUCKING, INC.
AND TRANSAM TRUCKING, INC.
DEPOSITION OF FERNANDO TECHY, M.D.

1    either September or October of '23, I think.

2    BY ESSAY EDEN:

3         Q    Okay.  Are you still treating Ms. Ledesma?

4         A    No.

5         Q    And why is that?

6         A    I -- I don't know.  I never -- she never came back to the

7    office.

8         Q    And I think you testified earlier that you were not her first

9    orthopedic doctor who treated her for her initial consultation, true or

10   untrue?

11        A    I -- I believe somebody saw her before me.

12        Q    Do you know why she still -- my question is, do you know why

13   she stopped treating with him and started treating with you?

14        A    I -- I don't know.  I assume she wasn't very pleased with

15   all, you know -- all the treatment.  That -- that's -- I -- I -- I never

16   really asked, so I don't know.

17        Q    So it wasn't that -- that the previous doctor referred her to

18   you, or wrote a referral to see if you would provide a concurring opinion.

19   It's your testimony today that you can't testify one way or the other

20   why she stopped treating with that doctor and why she started treating

21   with you?

22        A    Yeah, I don't -- I don't know exactly.  From -- from what I

23   understand, these -- and I don't know if they are a surgeon or not in,

24   you know -- or I -- I know she -- she came to my office, and all I know

25   is she was treating with somebody else and still in pain, and I -- I

ALCEON LEDESMA, JR. v. CHRITH
AND TRANSAM TRUCKING, INC.
DEPOSITION OF FERNANDO TECHY, M.D.

```
1   didn't really ask why.

2           ESSAY EDEN:  I'll pass the witness.

3           PHILIP MORGAN:  No further questions.  Reserve ours for time

4   at trial.

5           NOTARY:  Okay, everyone, I will take us off the record here.

6   Thank you to you all.

7           The -- the witness in this case will actually receive an e-

8   mail from Skribe that will enable you to review the video record and

9   submit a Statement of Changes, if any.

10          Counsel, as usual, I have placed a link in the chat box.  If

11  you could, please upload all of your exhibits there.  And someone from

12  Skribe will be reaching out regarding ordering a copy of the deposition

13  materials.

14          This concludes today's deposition of Fernando Techy, M.D.

15  The time is 7:39 p.m., Central Time.  We are off the record.

16

17

18

19

20

21

22

23

24

25
```

ALYSSON LEDESMA V. TYRUS CANTY
AND TRANSAM TRUCKING, INC.
DEPOSITION OF FERNANDO TECHY, M.D.

1          **IN THE UNITED STATES DISTRICT COURT OF**

2             **THE SOUTHERN DISTRICT OF TEXAS**

3                  **HOUSTON DIVISION**

4

5     **ALYSSON LEDESMA**            )

6          **PLAINTIFF,**            )

7                                    )

8     **VS.**                        )   **CIVIL ACTION NO. 4:23-CV-01983**

9                                    )

10    **TYRUS CANTY AND TRANSAM** )

11    **TRUCKING, INC.**             )

12         **DEFENDANTS.**           )

13

14         **\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\***

15    **CERTIFICATE OF NON-STENOGRAPHICALLY RECORDED PROCEEDING**

16      **VIDEOTAPED DEPOSITION OF FERNANDO TECHY, M.D.**

17                 **JULY 30, 2024**

18      AT THE REQUEST OF THE SCHEDULING ATTORNEY AND PURSUANT TO TEXAS

19  RULES OF CIVIL PROCEDURE 199.1(C), 203, AND ANY OTHER APPLICABLE

20  RULES, I, LEONARD M. RHEM, A NOTARY PUBLIC IN AND FOR THE STATE OF

21  TEXAS, DO HEREBY CERTIFY:

22

23      THE WITNESS, FERNANDO TECHY, M.D., WAS DULY SWORN BY ME IN A NON-

24  STENOGRAPHIC PROCEEDING THAT TOOK PLACE AS FOLLOWS:

25      LOCATION:  REMOTE, ONLINE AUDIO AND VIDEO

ALLISON LECESNA, ET AL. VERSUS MATTHEW
AND TRANSAM TRUCKING, INC.
DEPOSITION OF FERNANDO TECHY, M.D.

1       DATE:      JULY 30, 2024

2       TIME:      5:03 P.M., CDT

3       EVENT:     DEPOSITION

4       THE TESTIMONY AND PROCEEDING WERE NON-STENOGRAPHICALLY RECORDED

5  BY THE SCHEDULING ATTORNEY USING ELECTRONIC AUDIO AND/OR AUDIOVISUAL

6  RECORDING METHODS THROUGH ZOOM SOFTWARE.

7

8       THE NON-STENOGRAPHIC AUDIO AND/OR AUDIOVISUAL RECORDING MADE BY

9  THE SCHEDULING ATTORNEY IS INTELLIGIBLE, ACCURATE AND TRUSTWORTHY AND

10 IS A TRUE RECORD OF THE TESTIMONY GIVEN BY THE WITNESS. ALL PARTIES

11 WHO ATTENDED THE PROCEEDING AGREED TO SKRIBE, INC.'S TERMS AND

12 CONDITIONS AND AGREED TO THE PROCEEDING BEING RECORDED NON-

13 STENOGRAPHICALLY USING ELECTRONIC AUDIO AND/OR AUDIOVISUAL RECORDING

14 METHODS.

15

16      THE NON-STENOGRAPHIC AUDIO AND/OR AUDIOVISUAL RECORDING AND THIS

17 CERTIFICATE WERE ELECTRONICALLY DELIVERED TO ALL PARTIES WHO ATTENDED

18 THE EVENT ON OR ABOUT AUGUST 6, 2024 AND THIS CERTIFICATE MAY BE FILED

19 WITH THE COURT, PER TEXAS RULE OF CIVIL PROCEDURE 203.2.

20

21      THE AMOUNT OF TIME USED BY EACH PARTY AT THE DEPOSITION IS AS

22 FOLLOWS:

23      ATTORNEY 1: PHILIP J. MORGAN

24      DURATION OF EXAMINATION: 72 MINUTES

25      ATTORNEY 2: ESSAY EDEN



ALISSON LECESMAY J. TURCO ET AL.
AND TRANSAM TRUCKING, INC.
DEPOSITION OF FERNANDO TECHY, M.D.

1    DURATION OF EXAMINATION: 61 MINUTES

2    THE AMOUNT OF THE CHARGES TO THE SCHEDULING ATTORNEY FOR

3 PREPARING THE ORIGINAL NON-STENOGRAPHIC RECORD IS $_____.

4

5    THE NON-STENOGRAPHIC AUDIO AND/OR AUDIOVISUAL RECORDING WAS

6 ELECTRONICALLY DELIVERED TO THE WITNESS OR TO THE ATTORNEY FOR THE

7 WITNESS FOR REVIEW AND SIGNATURE ON AUGUST 6, 2024 AND THE STATEMENT

8 OF CHANGES WAS RETURNED BY EMAIL BY SEPTEMBER 6, 2024 (OR) WAS NOT

9 RETURNED BY THE WITNESS OR BY THE ATTORNEY FOR THE WITNESS. IF

10 RETURNED, THE STATEMENT OF CHANGES IS ATTACHED HERETO.

11

12    I FURTHER CERTIFY THAT I AM NOT RELATED TO ANY OF THE PARTIES TO

13 THIS ACTION BY BLOOD OR MARRIAGE AND AM IN NO WAY FINANCIALLY

14 INTERESTED IN THE OUTCOME OF THIS MATTER.

15

16    IN WITNESS THEREOF, I HAVE HEREUNTO SET MY HAND THIS 6TH DAY OF

17 AUGUST, 2024.

18

19    _Leonard M Rhem_

20    _____

21    LEONARD M. RHEM

22    TEXAS NOTARY COMMISSION: 132988515

23

24

25

ALISSON BECKMAN, TRICK UNITS
AND TRANSAM TRUCKING, INC.
DEPOSITION OF FERNANDO TECHY, M.D.

**STATEMENT OF CHANGES**

**TO NON-STENOGRAPHICALLY RECORDED PROCEEDING**

WITNESS NAME:        FERNANDO TECHY, M.D.

DATE OF PROCEEDING:   JULY 30, 2024

**Timecode**          **Page & Line**              **Change**            **Reason**

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Created by Skribe | support@skribe.ai

ALISSON LEUEMAA VS. TRANSAM DRIVER
AND TRANSAM TRUCKING, INC.
DEPOSITION OF FERNANDO TECHY, M.D.

```
 1    I, FERNANDO TECHY, M.D., HAVE REVIEWED THE NON-STENOGRAPHIC RECORD AND

 2    HEREBY AFFIX MY SIGNATURE THAT IT IS INTELLIGIBLE, ACCURATE AND

 3    TRUSTWORTHY AND IS A TRUE RECORD OF THE TESTIMONY GIVEN BY ME ON JULY

 4    30, 2024, EXCEPT AS NOTED ON THE PREVIOUS PAGE(S).

 5

 6                                  _____

 7                                  FERNANDO TECHY, M.D.

 8

 9    THE STATE OF _____

10    COUNTY OF _____

11

12           BEFORE ME, _____, ON THIS DAY

13    PERSONALLY APPEARED FERNANDO TECHY, M.D. KNOWN TO ME OR PROVED TO ME

14    UNDER OATH OR THROUGH _____, (DESCRIPTION OF

15    IDENTITY CARD OR DOCUMENT) TO BE THE PERSON WHOSE NAME IS SUBSCRIBED

16    TO THE FOREGOING INSTRUMENT AND ACKNOWLEDGED TO ME THAT THEY EXECUTED

17    THE SAME FOR THE PURPOSES AND CONSIDERATION THEREIN EXPRESSED.

18

19           GIVEN UNDER MY HAND AND SEAL OF OFFICE THIS _____ DAY

20    OF _____, _____.

21

22                                  _____

23                                  NOTARY PUBLIC IN AND FOR

24                                  THE STATE OF TEXAS

25
```